# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| **NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION, et al.,** | § § § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 3:11-cv-3200-O** |
| **v.** | § § | |
| **THE CITY OF DALLAS, et al.,** | § § | |
| **Defendants.** | § § § | |

## <u>ORDER</u>

Before the Court are Plaintiffs' Application for a Preliminary Injunction, with brief and appendix in support (ECF Nos. 1, 6-7); Defendants' Response in Opposition, with appendix in support (ECF Nos. 16-17); Plaintiffs' reply (ECF No. 26); and Defendants' sur-reply (ECF No. 45). Also before the Court are affidavits and exhibits submitted by the parties, along with two amicus briefs filed by the American Forest Paper Association (ECF Nos. 34-35) and the North Texas Association of Public Employees (ECF No. 48) respectively. Finally, Defendants have filed objections to certain of Plaintiffs' affidavits and exhibits (ECF No. 44), and Plaintiffs have filed a response thereto (ECF No. 46). Having considered Plaintiffs' application for injunctive relief, the evidence before the Court at this time, and the applicable law, the Court finds that Plaintiffs' application should be and is hereby **GRANTED.**[1]  The Court further finds that Defendants'

---

[1]  Because the Court finds that a preliminary injunction is appropriate in this case on the basis of Plaintiffs' Contract Clause claim, and given the need for an expedited resolution of Plaintiffs' application for a preliminary injunction, the instant order addresses only Plaintiffs' Contract Clause claim. Nevertheless, it appears from the presentation made at the preliminary injunction hearing that Plaintiffs, at least in the context of their application for a preliminary injunction, have not pursued their federal anti-trust claims or

objections to certain of Plaintiffs' affidavits and exhibits (ECF No. 44) should be and are hereby **OVERRULED.**

## I.        FACTUAL & PROCEDURAL BACKGROUND

The above-styled action arises out of Dallas City Ordinance No. 28427, hereinafter referred to as the Flow Control Ordinance, passed by the Dallas City Council on September 16, 2011 and originally scheduled to be enacted on January 2, 2012. *See generally* Pls.' Ex. 1. The substance of the Flow Control Ordinance, and the circumstances surrounding this enactment, are discussed in depth throughout this order. Currently at issue before the Court is whether Plaintiffs have met their burden to obtain preliminary injunctive relief against the City's enactment of the Flow Control Ordinance. The Flow Control Ordinance was originally scheduled to be enacted on January 2, 2012. Nevertheless, the City agreed to postpone enforcement of the Ordinance for thirty days following the Court's preliminary injunction hearing in this case, which was held on January 12, 2012. Having considered the pleadings, the evidence available at this juncture in the proceedings, and the applicable law, the Court finds that Plaintiffs have satisfied their burden for obtaining a preliminary injunction.

## II.       PRELIMINARY INJUNCTION STANDARD

As an initial matter, the Court is cognizant of its responsibility to set forth findings of fact

---

their state law preemption claims. Plaintiffs' remaining claims include that the challenged ordinance involves a standardless delegation of power, violates the due course of law provisions under the Texas Constitution, is unconstitutionally vague, and was enacted without proper notice and hearing in violation of the City Charter. The Court finds that a separate hearing would be required to determine whether Plaintiffs have satisfied the preliminary injunction standard as to any of these claims. Given the outcome of the instant order, and for the sake of convenience and efficiency, the Court will take up these issues at an expedited trial on the merits of Plaintiffs' claims. *See* Fed. R. Civ. P. 65(a)(2). A trial date will be set by separate scheduling order.

and conclusions of law with sufficient particularity to provide a basis for appellate review. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 (5th Cir. 1989). In reaching its decision, the Court has found it necessary to resolve few factually material disputations. Where it has done so in this decision, the Court construes its specific findings as the findings of fact required for appellate review.

The Fifth Circuit set out the requirements for a preliminary injunction in *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). To prevail on a preliminary injunction the movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *Id.*; *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

The movant must clearly carry the burden of persuasion with respect to all four requirements in order to qualify for a preliminary injunction. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction. Fed. R. Civ. P. 65(c).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal*, 489 F.2d at 572). A preliminary injunction "is an extraordinary and drastic

remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).   Even when a movant establishes each of the four *Canal* prongs, the decision whether to grant or deny a preliminary injunction remains discretionary with the court.   *Miss. Power & Light Co.*, 760 F.2d at 621.   The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.   *Id*.

## III.   CONTRACT CLAUSE STANDARD

Under the Contract Clause of the Constitution, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."   U.S. Const. art I, § 10.   Given the potential of the Contract Clause to infringe on a State's sovereignty, whether to include this provision in the Constitution was the subject of vigorous debate among the Framers.   *See, e.g.*, Akhil Reed Amar, *America's Constitution: A Biography* 124 (2005).   Ultimately, however, the decision to accept the Contract Clause represents the "high value the Framers placed on the protection of private contracts."   *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978).

"It long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties."   *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 (1977).   "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people."   *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotations omitted); *see also* The Heritage Foundation, *The Heritage Guide to the Constitution* 171-75 (Edwin Meese III et al. eds., 2005) (outlining the evolution of Contract Clause jurisprudence from the view that its terms were absolute to a

4

recognition of police power exceptions). To determine whether a state has impaired its own contractual obligations in violation of the Contract Clause, a court must conduct a three-step analysis. *See United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010).

> A.    Substantial Impairment of a Contractual Relationship

"[T]he first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.*, 438 U.S. at 245. "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992).

"In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *U.S. Trust Co. of N.Y.*, 431 U.S. at 18 n.14. "[T]he terms to which the contracting parties give assent may be express or implied in their dealings . . . ." *Gen. Motors Corp.*, 503 U.S. at 187. Under Texas law, the "primary goal [of construing contracts] . . . is to give effect to the written expression of the parties' intent." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). In this context, "parol evidence of the parties' intent"–such as course of dealing, course of performance, and trade usage–"is not admissible to create an ambiguity, [but] the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists." *See id.* (internal citations omitted).

In determining whether the impairment of a contract is substantial, a court should consider "the extent to which the law upsets the reasonable expectations the parties had at the time of contracting, regarding the specific contractual rights the state's action allegedly impairs." *United*

5

*Healthcare Ins. Co.*, 602 F.3d at 627.  "Total destruction of contractual expectations is not necessary for a finding of substantial impairment . . . [but] state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves Grp., Inc.*, 459 U.S. at 411.  Factors relevant to this analysis include whether "the subject matter of the contracts had been subject to regulation at the time the contracts were made," *see Lipscomb v. Columbus Mun. Separate Sch. Dist.,* 269 F.3d 494, 504 (5th Cir. 2001), and whether the terms of the contracts "suggest that [the parties] knew [their] contractual rights were subject to alteration" by future state regulation, *see Energy Reserves Grp., Inc.*, 459 U.S. at 416.

B.    Significant and Legitimate Public Purpose

"If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem."  *Energy Reserves Grp., Inc.*, 459 U.S. at 411-12 (internal citation omitted).  "[T]he public purpose need not be addressed to an emergency or temporary situation."  *Id.* at 412.  "[T]he legislative interest in addressing a fiscal emergency is a legitimate public interest . . . [but] the purpose may not be simply the financial benefit of the sovereign."  *See Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444-48 (1934)).  Where "the face of the [challenged law], the events surrounding its enactment, and . . . its effect" indicate that the State impaired its own contractual obligations on a prohibited basis, the Fifth Circuit has rejected the State's claim that it was motivated by other, legitimate purposes.  *See United Healthcare Ins. Co.*, 602 F.3d at 631.

C.    Reasonable and Necessary to Achieve its Purpose

"Once a legitimate public purpose has been identified, the next inquiry is whether the

6

adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption. *Energy Reserves Grp., Inc.*, 459 U.S. at 412 (quoting *U.S. Trust Co. of N.Y.*, 431 U.S. at 22). In other words, a court must "ask whether the challenged law was reasonably necessary to achieve [its] purpose." *United Healthcare Ins. Co.*, 602 F.3d at 627 (internal quotation marks omitted). As a general rule, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure," including the impairment of contracts. *See Energy Reserves Grp., Inc.*, 459 U.S. at 413 (internal quotations omitted).

The foregoing analysis applies when the contracts impaired by a state are between private parties. When a state has impaired its own contractual obligations, the analysis changes in two ways. First, a court must determine whether the State had the "power to create irrevocable contract rights in the first place, rather than [inquire] into the purpose or reasonableness of the subsequent impairment." *U.S. Trust Co. of N.Y.*, 431 U.S. at 23. Here, the question is "whether the contracts surrender 'an essential attribute of [the State's] sovereignty,'" such as the right of a state to exercise its police power. *See Libscomb*, 269 F.3d at 505 (quoting *U.S. Trust Co. of N.Y.*, 431 U.S. at 23). If so, the contracts are void *ab initio*, and cannot form the basis of a Contract Clause claim. *See U.S. Trust Co. of N.Y.*, 431 U.S. at 23-24; *see also United Healthcare Ins. Co.*, 602 F.3d at 628 n.7.

Second, if the contracts are subject to the Contract Clause, a court must continue to assess the reasonableness and necessity of the state's impairment of its contractual obligations, using a "stricter standard" than applied to private contracts. *See Energy Reserves Grp., Inc.*, 459 U.S. at 412 n.14. In this context, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *U.S. Trust Co. of N.Y.*, 431

7

U.S. at 26.[2]   A state's impairment of its own contracts is unnecessary when "less drastic" or "alternative means" are available for achieving the State's goals.  *See id.* at 29-31.  Accordingly, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives . . . [or] to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."  *Id.* at 30-31.[3]  In this context, it is unreasonable for a state to impair its own contracts when the concerns prompting the impairment were "not unknown" to the State at the time it entered into the contracts, and "subsequent changes [in the circumstances] were of degree and not of kind."  *See id.* at 31-32.

## IV.   ANALYSIS

### A.   Substantial Likelihood of Success on the Merits

#### 1.   *Does the Flow Control Ordinance operate as a substantial impairment of a contractual relationship?*

In this case, the Court must first determine whether the Flow Control Ordinance operates as

---

[2] At the heart of Defendants' objections to Plaintiffs' affidavits and exhibits is Defendants' assertion that "extrinsic evidence respecting the meaning or intent of the [Flow Control] Ordinance is" irrelevant to this litigation.  *See* Defs.' Objections ¶¶ 3-10, ECF No. 44.  Defendants would have the Court limit its analysis to considering "the detailed legislative intent . . . [which] appears on the face of the [Flow Control] Ordinance" and an Administrative Directive issued by Director Nix meant to clarify the definition of "recyclable material" as used in the Flow Control Ordinance.  *See id.* ¶ 3.  Given that the City's self-interest is at stake, this level of deference to legislative pronouncements is inappropriate.  *See U.S. Trust Co. of N.Y.*, 431 U.S. at 26.  Accordingly, Defendants' objections as to relevance are **OVERRULED.**  Defendants' remaining objections are likewise **OVERRULED.**

[3] Defendants characterize Plaintiffs' Contract Clause claim as an "improper attempt to inject the judiciary in the middle of a policy debate over economic and social legislation."  *See* Defs.' Resp. Opp'n Pls.' Appl.' Prelim. Inj. 9, ECF No. 16.  Contrary to Defendants' suggestion, the Court is not legislating by examining the circumstance surrounding the enactment of the Flow Control Ordinance.  Particularly where the State's self-interest is involved, as in this case, the Supreme Court calls for a careful evaluation to determine whether a constitutional violation has occurred.  *See U.S. Trust Co. of N.Y.*, 431 U.S. at 30-31; *see also Pineman v. Oechslin*, 494 F. Supp. 525, 549 (D. Conn. 1980), *vacated on other grounds by* 637 F.2d 601 (2d Cir. 1981).

a substantial impairment of a contractual relationship.  Based on the evidence currently before the Court, the Court finds that it does.

The contracts allegedly impaired in this case are Ordinances (the "Franchise Agreements") granted by the City in favor of certain Plaintiffs (the "Franchisees").  *See, e.g.*, Pls.' Ex. 10 (Dall., Tex., Ordinance 22619) (Mar. 28, 2007)).[4]  Each of the Franchise Agreements at issue went into effect on March 28, 2007; remains in effect for a term of at least twenty years; and contains identical terms, with the exception that each Franchise Agreement lists a different Franchisee.  *Compare id.*, *with* Pls.' Exs. 11-14 (Dall., Tex., Ordinances 26645, 26664, 26614, 26667) (Mar. 28, 2007)).  The Franchise Agreements begin by describing their substance as "granting a franchise . . . pursuant to Chapter XIV, City Charter and Chapter 18, Dallas City Code, to own, operate and maintain a solid waste collection service within the City of Dallas."  *See* Pls.' Ex. 10, at 1.  Likewise, the "Granting" section of the Franchise Agreements states that "subject to all terms and conditions contained in this Ordinance, the Texas Constitution, the City Charter, the City Code, other City ordinances as from time to time may be in effect, and applicable federal law, the City hereby grants the Franchisee non-exclusive permission and privilege solely for the purpose of operating and maintaining a Solid Waste Collection Service in, over, along and across the Public Ways in the Authorized Area."  *See id.* § 3.

---

[4]   The Plaintiffs to this action may be categorized as follows.  *See* Am. Compl. ¶¶ 7-17, ECF No. 36.  The following Plaintiffs, referred to as the Franchisees, have Franchise Agreements with the City for solid waste collection services: Blue Bonnet Waste Control, Inc; IESI TX Corporation ("IESI"); Republic Waste Services of Texas, Ltd. ("Republic"); Allied Waste Systems, Inc. ("Allied"); and Waste Management of Texas, Inc.  With the exception of Plaintiff IESI, each Franchisee also owns or operates a landfill, Materials Recovery Facility ("MRF"), or other recycling facility.  None of the Franchisees' landfills is located within the City.  However, the Franchisees have recovery facilities and MRFs located both inside and outside of Dallas.  Plaintiff Camelot Landfill, TX, LP is a non-Franchisee affiliate of the Republic and Allied Plaintiffs, and operates a landfill outside the City.  The remaining Plaintiffs, National Solid Wastes Management Association and Business Against Flow Control, are non-Franchisee associations whose members include certain Franchisees, waste haulers, and waste generators, among others.

The definitions section of the Franchise Agreements provide that the term "Solid Waste Collection Service shall mean the term as defined in Section 18-29(5) of the City Code." *See id.* § 2(n).  For its part, Section 18-29(5) of the City Code defines "SOLID WASTE COLLECTION SERVICE" as "the business of: (A) removing wet or dry solid waste from any premises; or (B) transporting, processing, or disposing of wet or dry solid waste." *See* Pls.' Ex. 7 (Dall., Tex., City Code ch. 18 (2011)), § 18-29(5).

As outlined above, the express terms of the Franchise Agreements give the Franchisees an ongoing contractual right to operate and maintain a solid waste collection service, defined as a business consisting of removing, transporting, processing, or disposing of solid waste.[5]  At issue now is the scope of the Franchisees' right to engage in solid waste disposal under the Franchise Agreements.  In this context, the Franchise Agreements place no limits on where the Franchisees may dispose of solid waste, except to provide that "[d]isposal of all solid waste collected by the Franchisee from premises within the Authorized Area must be made at an authorized solid waste disposal, collection, or processing facility." *See* Pls.' Ex. 10, § 4(d).  The parties dispute what is meant by the term "authorized solid waste disposal, collection, or processing facility."  To resolve this conflict, the Court must interpret the term "authorized" according to its ordinary meaning, the contract as a whole, and in light of the circumstances surrounding the Franchise Agreements.

---

[5]  At the preliminary injunction hearing, the City argued that the Franchise Agreements were merely haulers' contracts.  If the City wished to limit the Franchise Agreements to authorizing hauling services, it should have defined solid waste collection service to only include collecting and transporting solid waste.  However, the City's definition of a solid waste collection service also includes the business of processing and disposing of solid waste.  The distinction between collecting and transporting–or hauling services–on the one hand, and processing and disposal on the other is made clear by Mary Nix, the City's Director of Sanitation Services–who defined processing and disposal as follows: "Typically [processing] refers to some manipulation of the waste product to some other form . . . Disposal typically means the – either the final burial in a landfill or the final disposition of – in some manner[] such as incineration in which the product has no further use." *See* Pls.' Ex. 27 (Dep. Mary Nix), at 127:4-12.

Under Mirriam-Webster's definition of "authorize," a facility is authorized if "invest[ed] especially with legal authority."  Merriam Webster Online, http://m-w.com (last visited Jan. 20, 2012).  The Franchise Agreements do not alter this common, ordinary meaning of authorized, and do not otherwise limit the right of the Franchisees to dispose of solid waste collected within the City. In fact, when viewed as a whole, the structure of the Franchise Agreements demonstrates that this common, ordinary meaning of "authorized" is precisely what the parties intended.  For instance, the Franchise Agreements provide that the Franchisees must pay the City "rental compensation" for their franchise rights "in an amount equal to four percent (4%) of the Franchisee's gross receipts (hereinafter called the 'Franchise Fee')."  *See* Pls.' Ex. 10, §6(a).  The  Franchisee Fee is assessed against the Franchisees generally, but "disposal fees paid to the City by the franchisee for disposal of solid waste at the City's landfill" are excluded from the Franchisees' gross receipts for purposes of calculating the Franchisee Fee. *Id.* § 6(a)(4)(I).  By giving the Franchisees this financial incentive to use the City's landfills, but not requiring such use, the Franchise Agreements recognize the right of the Franchisees to dispose of solid waste at other legally authorized disposal, collection, or processing facilities.  Furthermore, the Franchise Agreements demonstrate that if the City wanted to invest the term "authorized" with a definition more limited than its common, ordinary meaning, the City had the ability to do so.  For example, the Franchise Agreements specifically define the term "Authorized Area" to mean "the entire area from time to time within the corporate limits of the City of Dallas."  *See id.*  The Franchise Agreements repeatedly use the capitalized phrase "Authorized Area" when invoking this subjective definition.  If the City intended the term "authorized" to mean specifically authorized by the City, located within the City, or owned or operated by the City, the City could have and should have expressed this intent through the written terms of the Franchise

11

Agreements. Instead, the Franchise Agreements give the Franchisees the right to engage in disposal at an "authorized" facility, or at any site legally authorized to operate as a disposal, collection, or processing facility.

The circumstances surrounding the Franchise Agreements further support a finding that the parties intended the term "authorized" to carry its common, ordinary meaning, such that the term is not ambiguous or unclear. As explained by Mary Nix, the City's Director of Sanitation Services ("Director Nix"), a common understanding of the term "authorized facility" as used in the solid waste industry is a "permitted facility," or a facility with a permit. *See* Pls.' Ex. 27 (Dep. Mary Nix), at 137:13-17; *see also id.* at 134:17–18 (questioning Director Nix about the process of "permitting landfills" in Texas). Furthermore, Director Nix has explained her understanding that the Texas Commission on Environmental Quality ("TCEQ") is responsible for permitting landfills. *See id.* at 134:17-25. This understanding is correct under the relevant provision of the Texas Administrative Code, which predates the Franchise Agreements and provides that no person may engage in the "storage, processing, removal, or disposal of any solid waste . . . [without] a permit or other authorization from the Commission." 30 Tex. Admin. Code § 330.7. The Franchisees agree that the common understanding of the term "authorized facility" as used in the industry is a state-permitted facility. *See, e.g.*, Pls.' Ex. 28 (Dep. Lynn Lantrip), at 30:15-31:5; Pls.' Ex. 29 (Dep. Jody McCord), at 42:9-21. Accordingly, under the terms of the Franchise Agreements as commonly understood in the solid waste industry, the Franchisees had the right to dispose of solid waste collected within the City at any facility authorized, or permitted, to operate as a disposal, collection, or processing facility. This reading of the Franchise Agreements is entirely consistent with the common, ordinary meaning of the term authorized.

The course of dealings between the Franchisees and the City also supports this interpretation. It is undisputed that, in the decades before the Franchise Agreements were executed, "the collection, transportation, recycling, and disposal of solid waste produced or generated in Dallas . . .[was] handled almost exclusively by private companies that chose among authorized facilities to dispose of waste based on price, proximity, and quality of service." *See* Pls.' Ex. 39 (Decl. Lynne Lueb), ¶ 4. Consistent with this history, Director Nix admits that from at least 2005 until the passage of the Flow Control Ordinance in 2011, the Franchisees were not required by rule or law to take solid waste collected or generated within the City to a City-owned facility. *See* Pls.' Ex. 27, at 227:19-228:2. Based on the foregoing, the Court finds that the plain language of the Franchise Agreements granted the Franchisees the contractual right to dispose of solid waste collected within the City at any location legally authorized, or permitted, to operate as a disposal, collection, or processing facility.

The next question before the Court is whether the Flow Control Ordinance impairs the Franchisees' contractual rights. The Flow Control Ordinance requires "that all dry and wet solid waste generated, found, or collected in the city of Dallas be disposed of at a transfer station or landfill site owned or operated by the city." *See* Pls.' Ex. 1 (Dall., Tex., Ordinance 28427 (Sept. 16, 2011)), at 1. Specifically, the Flow Control Ordinance makes it "an offense if, at any location other than the Northwest (Bachman) transfer station, the McCommas Bluff landfill, or another transfer station or landfill site owned or operated by the city, the person disposes of any dry or wet solid waste (or other waste material) that has been generated, found, or collected inside the city." *See id.* § 4 (amending Dall., Tex. City Code ch. 18 (2011), § 18-10(a)(1)(B)). This Flow Control Ordinance–which diverts the flow of any solid waste collected or transported within the City to a site owned or operated by the City–clearly impairs the Franchisees' rights under the Franchise

13

Agreements, namely the Franchisees' right to dispose of solid waste collected within the City at any location legally authorized to operate as a disposal, collection, or processing facility.

Finally, the Court must determine whether the impairment of the Franchisees' contractual rights is substantial. Here, the Court must consider the Franchisees' reasonable expectations at the time of the Franchise Agreements with regard to their right to dispose of solid waste collected in the City at any authorized facility. In doing so, the Court first considers the extent to which this subject matter was subject to regulation at the time of the Franchise Agreements. *See Lipscomb*, 269 F.3d at 404. There is no dispute between the parties that, at the time of the Franchise Agreements, solid waste disposal was subject to heavy regulation at the state level but was minimally regulated by the City. Accordingly, the Franchisees admit that the State regulates solid waste disposal from cradle to grave. By contrast, Director Nix has explained that under the license and permit system that preceded the Franchise Agreements, the City's oversight of solid waste disposal was "moderate," consisting primarily of annual reporting requirements, but no day-to-day supervision. *See* Pls.' Ex. 27, at 128:20-129:10. Furthermore, Director Nix stated that the City's treatment of solid waste disposal under the Franchise Agreements was intended to maintain this scope of supervision, with the exception of certain additional reporting and audit requirements. *See id.* at 131:1-25. The City's minimal regulation of solid waste disposal at the time of the Franchise Agreements weighs in favor of a finding of substantial impairment.

Second, the Court considers whether the terms of the Franchise Agreements indicate that the Franchisees knew that their contractual rights were subject to alteration by future regulation. *See Energy Reserves Grp., Inc.*, 459 U.S. at 416. In this context, the City points to its express reservation of police powers in the Franchise Agreements. Defs.' Surreply 3, ECF No. 45.

14

Specifically, the Franchise Agreements provide:

> In accepting this Ordinance, the Franchisee acknowledges that its rights under this Ordinance are subject to the police power of the City to adopt and enforce general ordinances *necessary* to the health, safety, and welfare of the public.  Franchisee shall comply with all applicable general laws and ordinances enacted by the City pursuant to such powers.   Any conflict between the provisions of this Ordinance and any other present or future *lawful* exercise of the City's police power shall be resolved in favor of the latter.

*See* Pls. Ex. 10, § 12(s) (emphasis added).  According to the City, this clause and similar provisions in the Franchise Agreements demonstrate that any rights granted to the Franchisees are subject to the City's right to exercise its police powers, and to pass future laws regarding solid waste disposal. Defs.' Surreply 3, ECF No. 45.  The City is correct to note that the terms of the Franchise Agreements put the Franchisees on notice that their contractual rights are subject to potential future changes in the law.  In support of this position, the City offers the affidavit of Stephen L. Moore, the operator of Moore Disposal Corporation, who states that when his company became a Franchisee in 2007, he "anticipated that the rules of the game might change.  Any reasonable person in the waste hauling industry would have anticipated this because such change is not uncommon."  *See* Aff. Stephen L. Moore ¶ 6, ECF No. 20.  On its face, this fact would seem to weigh against a finding of substantial impairment.  *See Energy Reserves Grp., Inc.*, 459 U.S. at 416.  Importantly, however, the City's own reservation of police powers makes clear that the Franchisees assumed the risk of *lawful, necessary* exercises of the police power.  *See* Pls. Ex. 10, § 12(s).  In light of this limiting language, the terms of the Franchise Agreements regarding future changes in the law do not weigh heavily in favor or against a finding of substantial impairment.

Finally, the Court notes the substantial financial impact that the Flow Control Ordinance

15

would have on the solid waste disposal business of certain Franchisees.  As discussed previously, the Franchise Agreements give the Franchisees the right to operate and maintain solid waste disposal services, including the business of removing, transporting, processing, or disposing of solid waste.  For those Franchisees that transport solid waste collected in the City for disposal at their own facilities, whether inside or outside of the City, the Flow Control Ordinance effectively "eliminates [their] ability to participate in a – in a whole line of business, the disposal line of business." *See* Pls.' Ex. 31 (Dep. Nicholas Stefkovich), at 43:2-6.  This impact, standing alone, indicates that the impairment at issue in this case is substantial.  Furthermore, the City has estimated that the Flow Control Ordinance will bring between 850 and 900 thousand tons of waste to City landfills, and will create between $15 and $18 million in new revenue from disposal fees.  *See* Pls.' Ex. 18 (The Green Path for Dallas' Trash: Briefing to City Council, Sept. 7, 2011), at 19; *see also* Pls.' Ex. 3 (Comments of Mayor Rawlings at City Council Meeting, Sept. 28, 2011).  Even assuming that only a small percentage of this solid waste–and the corresponding disposal fees–would otherwise have gone to Franchisees operating landfills outside the City, the diversion of solid waste under the Flow Control Ordinance will impact the Franchisees' disposal business in a substantial way.  In addition, the Franchisees have submitted evidence suggesting that their operating costs will significantly increase under the Flow Control Ordinance, since it would require certain Franchisees to drive longer distances and to pay higher disposal rates to deliver solid waste for disposal at the City's landfill. *See* Pls.' Ex. 36 (Decl. Thomas L. Brown), ¶ 9; Pls.' Ex. 41 (Decl. Douglas E. Branch), ¶ 6.

Based on the evidence before the Court at this time, the Court finds that the impairment at issue in this case is substantial.  Accordingly, the Court will proceed to consider whether the City's impairment of the Franchise Agreements is justified by a significant and legitimate public purpose.

2.    *Is the Flow Control Ordinance justified by a significant and legitimate public purpose?*

Based on the evidence before the Court at this stage of the proceedings, the Court has found that the Flow Control Ordinance operates as a substantial impairment of the Franchise Agreements. Next, the Court must consider whether the Flow Control Ordinance is justified by a significant and legitimate public purpose.  The Flow Control Ordinance recites numerous justifications for its enactment, including the City council's finding that flow control would:

> (1) ensure the safe and proper handling of solid waste within the city;
> (2) provide for environmentally sound, cost efficient solid waste management;
> (3) provide a convenient and effective means of financing the city's solid waste programs and services and ensuring the viability of the city's solid waste collection and disposal utility;
> (4) facilitate the development of data to ensure sufficient capacity for disposal and recycling of solid waste;
> (5) increase recycling of solid waste; and
> (6) deter illegal dumping of solid waste . . . .

*See* Pls.' Ex. 1, at 2.  The Flow Control Ordinance also expresses the City council's finding that flow control would "further[] the development of green technology and facilitat[e] the conservation of vital natural resources," given that "municipal solid waste has a tenable value as a waste-to-energy resource as well as extensive re-use advantages," and "a sizeable volume of a municipal solid waste stream is needed to implement emerging technology" in this area.  *See id.*  In the instant proceedings, the City has also suggested that the Flow Control Ordinance would "create new jobs."  *See* Defs. Resp. Opp'n Pls.' Appl. Prelim. Inj. 6, ECF No. 16.

Given the City's burden to justify impairing its own contracts, and after considering the face of the Flow Control Ordinance, the events surroundings its enactment, and its effect, the Court cannot accept the City's numerous proffered justifications for the Flow Control Ordinance.  *See*

*United Healthcare Ins. Co.*, 602 F.3d at 631.  Rather, the Court finds that, based on the evidence currently before the Court, the Flow Control Ordinance was enacted to raise revenue.  To begin, the Court notes that the Flow Control Ordinance diverts the flow of all solid waste found within the City to City-owned landfills.  *See generally* Pls.' Ex. 1.  Because the Flow Control Ordinance does not eliminate the tipping fees charged for disposal of solid waste at City-owned landfills, the Flow Control Ordinance not only diverts solid waste, but also diverts the revenue associated with disposing of that waste.  *See generally id.*  This revenue-raising effect of the Flow Control Ordinance was heavily emphasized during the City Council meeting at which the Flow Control Ordinance was adopted.  *See generally* Pls.' Ex. 3 (City Council Meeting, Sept. 28, 2011).  For his part, Mayor Rawlings explained the Flow Control Ordinance as follows: "There's 700 to 900 . . . thousand tons of commercial waste leaving the City of Dallas and people are making money off of that. Corporations outside of Dallas are making money off of that.  That could mean $15 to $18 million of revenue for the City coffers . . . This is a business revenue issue."  Mayor Rawlings was not alone in his emphasis on revenue.  Council members on both sides of the flow control issue repeatedly focused on the financial benefits of the Flow Control Ordinance, noting that solid waste is "a valuable commodity," "becoming more valuable," and opining that "[w]e need the funds, and I think [the Flow Control Ordinance is] a good way to get it."  *See id.* (comments by Council members Jerry Allen, Ann Margolin, and Sheffie Kadane).

In addition to focusing on the revenue-raising effects of flow control, the City Council considered the Flow Control Ordinance in conjunction with a resolution to establish the Southeast Oak Cliff Investment Fund.  *See* Pls.' Ex. 2 (City Council Resolution No. 112622, Sept. 28, 2011).  The resolution authorized the City Controller to deposit up to $1,000,000 per year in funds generated

by the Flow Control Ordinance into a fund "for the transformational development" of Southeast Oak Cliff.   *See id.* §§ 2, 5.   The resolution begins by noting that "the City is committed to economic initiatives that facilitate the development of retail amenities, quality mixed income housing and jobs in all areas of the city."   *See id.* at 1.   In addition, the resolution states that "a percentage of the increase in revenue . . . resulting from [the Flow Control Ordinance] may support economic development of communities located near the [City's] landfill in southeast Oak Cliff."   *See id.*   The Flow Control Ordinance and the resolution to establish the Southeast Oak Cliff Investment Fund were presented to the City Council for joint consideration, and were voted upon collectively, such that a vote for the Flow Control Ordinance was also a vote for the Southeast Oak Cliff Investment Fund.   *See* Pls.' Ex. 3.   Mayor Rawlings made the connection between the Flow Control Ordinance and the Southeast Oak Cliff Investment Fund explicit when he stated at the City Council meeting that "those citizens have waited long enough in this city for us to get them money . . . This is a moment of truth for the city of Dallas to decide whether we're going to find something that improves southern Dallas or are we just going to talk a good game."   *See id.*   These events surrounding the enactment of the Flow Control Ordinance demonstrate that it was enacted to raise revenue.

Based on the evidence available at this time, the Court finds that the Flow Control Ordinance was enacted as a revenue-raising measure.   Furthermore, the Court determines that the City's desire to raise revenue through the Flow Control Ordinance is not a significant and legitimate public purpose under the facts established at this stage in the proceedings, because the Flow Control Ordinance was not adopted to address a fiscal problem but was merely adopted for the financial benefit of the City.   *See Buffalo Teachers Fed'n*, 464 F.3d at 368.   The Flow Control Ordinance contains a declaration by the City that the measure would, among other things, "provide a convenient

and effective means of financing the city's solid waste programs and services . . . ."  *See* Pls.' Ex. 1, at 2.  Importantly, however, no financing problems existed in the City's Department of Sanitation Services in the years immediately prior to the passage of the Flow Control Ordinance.  To the contrary, the Department of Sanitation Services estimated that it would experience net revenues of $17.7 million in fiscal year 2009, $14.5 million in fiscal year 2010, and $15.5 million in fiscal year 2011.  *See* Pls.' Ex. 15 (Briefing to City, Aug. 20, 2008), at 42; Pls.' Ex. 16 (Sanitation Services Proposed FY10 Budget, Aug. 19, 2009), at 11; Pls.' Ex. 17 (Sanitation Services Proposed FY 11 Budget, Aug. 18, 2010).  In her deposition, Director Nix likewise estimated that, even excluding revenue generated by the Flow Control Ordinance, the net revenue of her department for the fiscal year 2012 would be $10 to $11 million.  *See* Pls.' Ex. 27, at 35:16-36:5.  Instead of raising revenue needed to finance the City's solid waste program and services, the Flow Control Ordinance will work to further increase the net revenue of the Department of Sanitation Services, which in turn will increase the balance in the City's general fund and the newly established Southeast Oak Cliff Investment Fund.  *See* Pls.' Ex. 27, at 36:6-14; 39:23-40:4.  By earmarking certain funds generated by the Flow Control Ordinance for deposit in the Southeast Oak Cliff Investment Fund, and placing no limitations on the use of the remaining revenue after its placement in the general fund, the City has undermined its own assertion that the Flow Control Ordinance was enacted to finance the City's solid waste program and services.  Instead, these facts make clear that the Flow Control Ordinance was a revenue-raising measure, meant to benefit the City generally–by an estimated $15 to $18 million annually–with up to $1 million directed to the Southeast Oak Cliff Investment Fund each year.  *See* Pls.' Ex. 18 (The Green Path for Dallas' Trash: Briefing to City Council, Sept. 7, 2011), at 19; *see also* Pls.' Ex. 3 (Comments of Mayor Rawlings at City Council Meeting, Sept. 28, 2011).

20

Based on the record at this stage of the proceedings, the Court cannot accept the City's assertion that its desire to finance the City's solid waste program and services is a significant and legitimate public purpose justifying the Flow Control Ordinance.

Based on the facts currently available to the Court, the Court has found that the purpose of the Flow Control Ordinance was to raise revenue and that this purpose is not significant and legitimate so as to justify the enactment of the Flow Control Ordinance.   Accordingly, the Franchisees have demonstrated a likelihood of success on their Contract Clause claim.   Even assuming, for the sake of argument, that the City was motivated by one of the other public purposes recited in the Flow Control Ordinance or the instant proceedings, the Court still finds that the Franchisees have carried their burden because these purposes are not significant and legitimate.   It is clearly established that "remedying . . . a broad and general social or economic problem" is a significant and legitimate public purpose. *See Energy Reserves Grp., Inc.*, 459 U.S. at 411-12. On the other hand, the "public purpose need not be addressed to an emergency or temporary situation" to be significant and legitimate. *See id.*   At the very heart of this analysis is the assumption that a "problem" or "situation" exists to be addressed or remedied. *See id.*

Here, the facts currently before the Court demonstrate that no "problem" or "situation" prompted the enactment of the Flow Control Ordinance.   Specifically, Director Nix stated in her deposition that she could not identify one example of illegal dumping in the City in the last fiscal year and that, in any case, a separate department is responsible for handling illegal dumping. *See* Pls.' Ex. 27, at 42:2-16.   Director Nix also admitted that, to her knowledge, there are no landfills in the City being operated without a permit or in violation of state law or regulations; no landfill in the City has been ordered to be closed by state or federal authorities within the last five years; no federal

21

cleanup actions have been brought against any landfills in the City within the last five years; and no price fixing or other organized crime influence exists with respect to solid waste collection, transportation, and disposal in the City. *See id.* at 43:2-44:23. Director Nix also agreed that solid waste in the City is currently being handled in an environmentally sound and cost efficient manner. *See id.* at 45:17-23. Elsewhere in her deposition, Director Nix emphasized that the Department of Sanitation Services is rated by citizens of the City as one of the top five services in a customer survey, with 73% of those surveyed rating solid waste collection services as excellent or good. *See id.* at 18:13-16, 21:5-12; *see also* Pls.' Ex. 5 (2009 Dallas Community Survey: Final Report Summary). Given these facts, the Court cannot say that the City has come forth with a significant and legitimate purpose to justify the Flow Control Ordinance.

Aside from Director Nix's testimony, other evidence currently before the Court also indicates that the Flow Control Ordinance was not enacted to address any existing "problem" or "situation" in the City. Thus, the Franchisees have offered as evidence a Local Solid Waste Management Plan (the "Plan") prepared for the City and submitted to the TCEQ. *See generally* Pls.' Ex. 19. Dated October 2011, the Plan states that "[a]lthough the current [solid waste] facilities are periodically updated and adjusted to meet the operational needs, there are no new solid waste facilities or facility expansions planned in the near future." *See id.* at 25. The Plan further declares that "[i]t is anticipated that there will be sufficient *private sector* recyclables processing capacity within the region through the planning period." *See id.* at 35 (emphasis added). Under the Plan, the "planning time period is 50 years, through 2060." *See id.* at 3. By representing in the Plan that no new solid waste facilities or expansions are planned for the near future, and that the private sector recyclables processing capacity will be sufficient for the fifty-year planning period, the City has undermined its

22

assertion that the Flow Control Ordinance was needed to "plan[] to accommodate the future disposal needs of Dallas residents." *See* Defs.' Resp. Opp'n Pls.' Appl. Prelim. Inj. 24, ECF No. 16.

Based on the foregoing evidence available at this stage of the proceedings, the Court finds that although the City has recited numerous laudable goals in support of the Flow Control Ordinance, none of its purported purposes for enacting the Flow Control Ordinance is significant and legitimate so as to justify the Flow Control Ordinance.

>    3.    *Is the Flow Control Ordinance reasonable and necessary to achieve its purpose?*

Based on the evidence available at this juncture, the Court has found that the Flow Control Ordinance is a revenue-raising measure passed simply for the financial benefit of the City, and is not otherwise justified by a significant and legitimate public purpose. Accordingly, the Court need not consider the final prong of the Contract Clause analysis. Importantly, however, the Court finds that the Franchisees have further demonstrated a substantial likelihood of success on the merits of their Contract Clause claim by establishing, from the evidence currently before the Court, that the Flow Control Ordinance is not reasonably necessary to achieve its non-financial goals. Accordingly, the Court will continue to consider the final prong of the Franchisees' Contract Clause claim.

Before assessing the reasonableness and necessity of the Flow Control Ordinance for achieving its purported purposes, the Court must ask whether the Franchise Agreements surrender an essential attribute of the City's sovereignty. *See Libscomb*, 269 F.3d at 505 (quoting *U.S. Trust Co. of N.Y.*, 431 U.S. at 23). If so, the Franchise Agreements are void ab initio. *See U.S. Trust Co. of N.Y.*, 431 U.S. at 23-24; *see also United Healthcare Ins. Co.*, 602 F.3d at 628 n.7. The Court has already determined that the Franchise Agreements gave the Franchisees a contractual right to operate

23

and maintain a solid waste collection service, defined as a business consisting of removing, transporting, processing, or disposing of solid waste. *See supra* Part IV.A.1. In assessing whether this contractual arrangement surrenders an essential attribute of the City's sovereignty, the Court emphasizes the distinction between a contract that surrenders the right of a City to exercise its inherent police powers, and a contract through which the City exercises those powers. *See Lipscomb*, 269 F.3d at 512.

In *Libscomb*, the Fifth Circuit found that a State did not surrender its police powers when it granted leases on land held in trust by the State for the funding of public schools, because the leases did not contract away the State's obligations to the trust but were an exercise of the State's police power to serve the trust purposes. *See id.* The Supreme Court's recent decision in *United Haulers*–cited repeatedly by the City–is also instructive here. *See generally United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343-44 (2007). In *United Haulers*, a dormant Commerce Clause case, the Supreme Court noted that it was hesitant to interfere with flow control ordinances passed by two counties because "waste disposal is both typically and traditionally a local government function." *See id.* at 344 (internal quotations omitted). The Supreme Court concluded its opinion by noting that "[t]he Counties' ordinances are exercises of the police power in an effort to address waste disposal . . . ." *See id.* at 348. *United Haulers* makes clear that flow control ordinances may constitute lawful exercises of a City's police power to regulate solid waste disposal. *See id.* Importantly, however, *United Haulers* implicitly recognizes that a City may properly exercise its police powers to regulate solid waste disposal through means other than flow control, as by authorizing the private sector to engage in waste collection services. *See id.* Accordingly, the Supreme Court stated that "the citizens [here] have chosen the government to

24

provide waste management services, with a limited role for the private sector in arranging for transport of waste from the curb to the public facilities . . . [but] the citizens could have left the entire matter for the private sector, in which case any regulation they undertook could not discriminate against interstate commerce." *Id.* at 343-44.

Here, the Court finds that the Franchise Agreements did not surrender the City's police power to regulate solid waste disposal for the benefit of its citizens, but were an exercise of that power. Specifically, the Court notes that the Franchise Agreements begin by declaring that "the City of Dallas is authorized to grant one or more non-exclusive franchises for the provision of solid waste collection service to premises within the City of Dallas." *See* Pls.' Ex. 10, at 1. The Franchise Agreements further declare that "the City Council of the City of Dallas is of the opinion that the granting of the franchise on the terms set forth in this Ordinance is in the public interest and in the interest of the City of Dallas and its residents." *See id.* These declarations are expressly incorporated into the terms of the Franchise Agreements. *See id.* § 1. By their own terms, the Franchise Agreements, which create "franchises for the provision of solid waste collection service," are an exercise of the City's police power to regulate solid waste disposal "in the public interest." *See id.* at 1 & § 1. Such an arrangement does not constitute a surrender of the City's police power to regulate solid waste disposal, but is a valid exercise of that power. *See United Haulers Ass'n*, 550 U.S. at 343-44; *see also Lipscomb*, 269 F.3d at 505.

Based on the foregoing, the Court finds that the Franchise Agreements do not surrender an essential attribute of the City's sovereignty. Accordingly, the Court must next determine whether the Flow Control Ordinance is reasonable and necessary to achieve its purported purposes. The Court has already listed the numerous justifications for the Flow Control Ordinance, which appear in the

text of the measure itself and in briefs in the instant proceedings. *See supra* Part IV.A.2. Applying the "stricter standard" to evaluate the necessity and reasonableness of the City's impairment of its own contracts in light of the evidence currently before the Court, the Court finds that the Flow Control Ordinance is neither necessary nor reasonable to achieve these purported purposes. *See Energy Reserves Grp., Inc.*, 459 U.S. at 412.

To begin, the Court notes that the Flow Control Ordinance, on its face, is not tailored to achieving its purported purposes. As discussed throughout this order, the Flow Control Ordinance diverts the flow of all solid waste within the City of Dallas to a City-operated landfill, and does not eliminate the disposal fees charged by the City at its landfills. It is apparent from the evidence before the Court that this flow control system is not tailored to achieving the purported purposes of the Flow Control Ordinance. To begin, Director Nix admitted in her deposition that she cannot identify any portion of the Flow Control Ordinance that would result in the generation of data about commercial waste, that the Flow Control Ordinance is not necessary to address illegal dumping issues, and that the Flow Control Ordinance, while valuable, is not necessary to increase the rate of recycling in Dallas. *See* Pls.' Ex. 27, at 51:17-54:21, 57:8-13, 271:18-22. Likewise, James Lattimore–a consultant hired by the City to analyze the potential impact of the Flow Control Ordinance on the commercial solid waste disposal industry in Dallas–testified that recycling in the City may increase after the Flow Control Ordinance due to two factors: higher awareness by waste generators, and encouragement by waste haulers. *See* Pls.' Ex. 30 (Dep. James Lattimore), at 97:1-99:24. Importantly, however, Lattimore went on to admit that flow control is not necessary to increase awareness by waste generators, that methods besides flow control could drive home the benefits of recycling to waste generators, and that he did not examine any of these alternatives for the City. *See*

*id.* The Plan submitted on behalf of the City to the TCEQ also indicates that flow control is not necessary to achieve the City's long-term goals with regard to solid waste disposal in the City. *See generally* Pls.' Ex. 19. The Plan represents that it "shall not prohibit, in fact or by effect, importation or exportation of waste from on political jurisdiction to another." *See id.* at 3. Because the "planning time period is 50 years, through 2060," the Plan effectively states that the City does not plan to implement flow control–"in fact or by effect"–for the next fifty years. *See id.* If flow control were necessary to the achievement of the City's purported purposes, the City would not have made such a representation.

Based on the foregoing evidence available at this stage of the proceedings, the Court finds that the Flow Control Ordinance does not have the effect of facilitating the development of data on solid waste disposal and recycling, increasing recycling, or deterring illegal dumping. Accordingly, the Flow Control Ordinance is not necessary to achieve these purposes. Likewise, nothing in the substance of the Flow Control Ordinance is tailored to the development or implementation of green technologies in the City. To the contrary, the evidence currently before the Court indicates that the absence of flow control has not impacted the City's ability to implement green technologies. The City has argued that its plan to develop a Materials Recovery Facility in Dallas is a "core component" of its green initiatives. *See* Defs. Resp. Opp'n Pls.' Appl. Prelim. Inj. 6, ECF No. 16. Explaining her failure to move forward with a Materials Recovery Facility in her six years as Director, Director Nix stated that her decision was due to a lack of funds and technology. *See* Pls.' Ex. 27, at 89:13–90:3. Importantly, however, Director Nix admitted that a lack of solid waste flow at the City's landfill was not a factor in this decision. *See id.* From this evidence, and the record before the Court at this time, it is clear that the Flow Control Ordinance does not have the effect of

achieving its purported purposes, and that the lack of flow control did not hinder the City in pursuing its green initiatives before the Flow Control Ordinance. Furthermore, particularly with regard to the City's purported purpose of increasing recycling and developing green technologies, it appears that the City did not consider less drastic, alternative means of achieving its goals. *See U.S. Trust Co. of N.Y.*, 431 U.S. at 29-31. Based on the foregoing, the Court finds that the Flow Control Ordinance is not necessary to achieve its purported purposes.

The evidence available to the Court at this time also suggests that the Flow Control Ordinance was an unreasonable means for achieving its purported purposes. The Court notes that the City has not come forth with any evidence to suggest that the facts giving rise to the public purposes underlying the Flow Control Ordinance were unknown to the City at the time it entered into the Franchise Agreements in 2007. *See id.* at 31-32. To the contrary, common sense dictates that the City was aware of the economic and environmental value of solid waste, data compilation, increased recycling, and the deterrence of illegal dumping when it entered into the twenty-year Franchise Agreements just five years ago. For example, the Landfill Manager of the McCommas Bluff Landfill has defended the Flow Control Ordinance by stating: "All of the waste brought to McCommas Bluff is disposed of in a manner that is consistent with the environmental goals of the City . . . [T]he City cannot be sure . . . that waste leaving the City is managed in a comparable manner. Flow control will provide that assurance." *See* Aff. Rick L. White ¶ 26, ECF No. 21. This situation was known to the City in 2007 and therefore cannot not justify the City's impairment of the Franchise Agreements. *See U.S. Trust Co. of N.Y.*, 431 U.S. at 29-31.[6] Even assuming that the

---

[6] The Court wishes to make expressly clear its belief that, had the City enacted the Flow Control Ordinance in 2007–before entering the Franchise Agreements at issue–the Flow Control Ordinance would not have violated the Contract Clause. So, at least in the context of the Contract Clause, the citizens of

issues cited by the City in support of the Flow Control Ordinance have become more pressing since 2007 "because of increased general concern with environmental protection and energy conservation," this change in circumstances is merely one "of degree and not of kind." *See id.* at 32. Given the factual record at this time, the Court concludes that the Flow Control Ordinance is an unreasonable means of achieving its purported purposes.

Based on the record before the Court at this time, the Court determines that Plaintiffs have established a substantial likelihood of success on the merits of their Contract Clause claim. Accordingly, the Court continues to consider the remaining factors in the preliminary injunction analysis.

B.      Likely Irreparable Injury

The Court finds that the Franchisees have established the threat of immediate, irreparable injury. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.*" La. Seafood Mgm't Council, Inc. v. Foster*, 917 F.Supp. 439, 442 n.1 (E.D. La. 1996) (quoting 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1, pp. 160-61 (1995)). In addition, irreparable injury may result from the enactment of an ordinance when a plaintiff faces fines and criminal penalties for violation of that ordinance once it is in effect. *See, e.g.*, *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008).

Here, while some evidence exists to suggest that the Franchisees' damages may be

---

Dallas would have been free either to enact flow control measures, to leave "the entire matter [of solid waste services] for the private sector," or to implement a hybrid public-private system. *See United Haulers Ass'n*, 550 U.S. at 343-44. The City in this case, however, is not working from a blank slate. Having chosen to address solid waste disposal through the Franchise Agreements, the City was not entirely unfettered in its decision to enact the Flow Control Ordinance, laudable though its purported purposes are.

quantifiable, the Franchisees argue that the Flow Control Ordinance will cause them irreparable injury when enacted because it will subject them to criminal penalties for noncompliance. *See* Pls.' Br. Supp. Appl. Prelim. Inj. 23-24, ECF No. 6.   Given the express terms of the Flow Control Ordinance and Chapter 18 of the City Code, it is unsurprising that the City does not dispute that the Franchisees face criminal penalties for noncompliance with the Flow Control Ordinance.   The Flow Control Ordinance provides that "[a] person commits an offense if" he or she violates the requirements of flow control. *See* Pls.' Ex. 1, § 4.   The Flow Control Ordinance also sets out two "defense[s] to prosecution" for such an offense. *See id.*   The Flow Control Ordinance further provides "[t]hat a person violating a provision of this ordinance, upon conviction, is punishable by a fine not to exceed $2,000." *See id.* § 7.   Under the Flow Control Ordinance, "CHAPTER[] 18 of the Dallas City Code, as amended, will remain in full force and effect, save and except as amended by this ordinance." *See id.* § 8.   For its part, Chapter 18 of the Dallas City Code makes expressly clear that violation of its provisions–including the provisions amended by the Flow Control Ordinance–may result in a "criminal penalty," and provides that "administrative penalties" may be assessed as an alternative punishment. *See* Pls.' Ex. 7 (Dall., Tex., City Code ch. 18 (2011)), § 18-12.1(f).   The City Code further provides that "[a] person is guilty of a separate offense for each day or part of a day during which the violation is committed, continued, or permitted." *See id.* § 12.1(a).

Based on the foregoing, the Court finds that if the Flow Control Ordinance goes into effect, the Franchisees will be forced to choose between foregoing their rights under the Franchise Agreements and facing serious criminal sanctions for noncompliance with an ordinance which, as discussed in Part V.A. above, the Franchisees have demonstrated is likely unconstitutional. Accordingly, the Franchisees have come forth with sufficient evidence to establish likely irreparable

injury, or immediate harm that cannot be compensated monetarily.  *See, e.g.*, *Villas at Parkside Partners*, 577 F. Supp. 2d at 878.

C.    Balance of Equities

The balance of equities in this case clearly weighs in favor of the Franchisees.  The City argues that the Franchisees would suffer only "speculative and insubstantial pecuniary harm" under the Flow Control Ordinance.  *See* Defs.' Resp. Opp'n Pls.' Appl. Prelim. Inj. 24, ECF No. 16. Despite this claim, the Court has already determined that the Flow Control Ordinance would have a substantial financial impact on the Franchisees, and would effectively eliminate the disposal line of business under the Franchise Agreements for those Franchisees that own landfills outside the City. *See supra* Part IV.A.1.  The City counters that, "if enjoined, [it] would find itself unable to advance the initiatives that mark the future of the City's most important planning to accommodate the future disposal needs of Dallas residents . . . [T]he time lost by the City is irretrievable."  *See* Defs.' Resp. Opp'n Pls.' Appl. Prelim. Inj. 24, ECF No. 16.  In addition, the City argues that its potential harm includes the loss of "substantial revenue" that would be generated by the Flow Control Ordinance. *See id.*  Neither of these arguments inures to the City's benefit.

First and foremost, it is clear from the evidence currently before the Court that the City is capable of accommodating the future disposal needs of City residents without enacting the Flow Control Ordinance. So, as previously discussed, the City's Plan, dated October 2011, represented that "no new solid waste facilities or facility expansions [are] planned in the near future," and that "there will be sufficient private sector recyclables processing capacity within the region through [2060]." *See* Pls.' Ex. 19, at 35; *see also supra* Part IV.A.2.  Furthermore, Director Nix has made clear that her decision to not proceed with a "core component" of the City's green initiatives–the development

of a Materials Recovery Facility–was based on a lack of funding and technology, not an insufficient solid waste stream at City landfills. *See* Pls.' Ex. 27, at 89:13–90:3; *see also supra* Part IV.A.2. Second, given the Court's finding that the City's use of the Flow Control Ordinance to raise revenue likely violates the Contract Clause, the City's interest in this revenue is not sufficient to tip the equities in the City's favor. Finally, the Court would reemphasize Director Nix's statement that, even without flow control, solid waste is currently being handled in an environmentally sound and cost efficient manner in the City. *See* Pls.' Ex. 27, at 45:17-23. Based on the foregoing, the Court finds that the City would suffer little to no harm as a result of an injunction, while the Franchisees would suffer immediate, significant harm if the Flow Control Ordinance were allowed to proceed.

D.     Public Interest

Because the City represents its inhabitants, "the interests of the public necessarily overlap considerably with [the City's] interests. Thus, the potential harm to the public interest is the same as the harm to the City . . . ." *See Six Kingdom Enters., LLC v. City of El Paso*, No. EP-10-CV-485-KC, 2011 WL 65864, at *10 (W.D. Tex. Jan. 10, 2011). As discussed immediately above, the evidence before the Court establishes that little or no harm would be suffered by the City if the Flow Control Ordinance were enjoined, especially in light of the fact that solid waste disposal is currently being handled in a safe manner in the City. *See supra* Part IV.C. Furthermore, members of the public who currently utilize the services of the Franchisees stand to benefit from an injunction in that they will be able to continue contracting for waste disposal services at the authorized facility of their choice. Based on the foregoing, the Court finds that a preliminary injunction would be in the public interest.

V.     CONCLUSION

Based on the evidence available to the Court at this time, the Court finds that Plaintiffs are likely to succeed on the merits of their Contract Clause claim; that Plaintiffs will suffer irreparable injury if the Flow Control Ordinance is allowed to take effect; that the balance of equities favors Plaintiffs; and that a preliminary injunction is in the public interest.

Accordingly, the Court hereby **GRANTS** Plaintiffs' Application for a Preliminary Injunction (ECF No. 1).  Defendants are hereby **ENJOINED** from enacting Dallas City Ordinance No. 28427 until further notice from the Court.  Plaintiffs are **ORDERED** to post a bond in the amount of $10,000.  The parties are granted leave to submit briefing, if they so desire, as to whether a higher or lower bond is appropriate in this case.   Defendants' objections to certain of Plaintiffs' affidavits and exhibits (ECF No. 44) are **OVERRULED.**

**SO ORDERED** on this **31st day** of **January, 2012.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

33