IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



| | | |
|---|---|---|
| NATIONAL SOLID WASTES MANAGEMENT ASSOCIATION, et al., | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:11-cv-3200-O |
| THE CITY OF DALLAS, et al., | § § | |
| Defendants. | § § § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs[1] filed this suit against The City of Dallas (the "City"), Mayor Mike Rawlings, and City Council members Pauline Medrano, Tennell Atkins, Dwaine Caraway, Monica Alonzo, Carolyn Davis, Jerry Allen, Linda Koop, and Angela Hunt. The amended complaint alleges that Defendants violated Plaintiffs' state and federal constitutional rights, as well as the City Charter, when Defendants passed City Ordinance No. 28427 (hereinafter referred to as the "Flow Control

---

[1]  The Plaintiffs to this action may be categorized as follows. The following Plaintiffs, referred to as the Franchisees, have Franchise Agreements with the City for solid waste collection services: Bluebonnet Waste Control, Inc. ("Bluebonnet"); IESI TX Corporation ("IESI"); Republic Waste Services of Texas, Ltd. ("Republic"); Allied Waste System, Inc. ("Allied"); and Waste Management of Texas, Inc. ("WMTI"). With the exception of Plaintiff IESI, each Franchisee also owns or operates a landfill, Materials Recovery Facility ("MRF"), or other recycling facility. None of the Franchisees' landfills are located within the City. However, the Franchisees have recovery facilities and MRFs located both inside and outside of Dallas. Plaintiff Camelot Landfill, TX, LP is a non-Franchisee affiliate of the Republic and Allied Plaintiffs, and operates a landfill outside the City. The remaining Plaintiffs—National Solid Wastes Management Association and Business Against Flow Control—are non-Franchisee associations whose members include certain Franchisees, waste haulers, and waste generators, among others. *See* Am. Compl. ¶¶ 7-17, ECF No. 36.

Ordinance").[2]   Plaintiffs seek to permanently enjoin the City from enacting the Flow Control Ordinance.

The parties agreed to submit this case for trial based on written submissions because the underlying facts are largely undisputed.[3]   *See* Joint Status Report 4, ECF No. 55.   Therefore, the Court sets out its findings of fact based on a preponderance of evidence and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).   The following findings of fact and conclusions of law are based upon the pleadings, testimony, evidence, and exhibits admitted on the record.   The Court provides a clear understanding of its decision in accordance with the level of detail required in this Circuit.   *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998).   Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.   Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.   For the reasons explained below, the Court grants Plaintiffs' request for an injunction.

## I.      FACTUAL & PROCEDURAL BACKGROUND

In 2007, five franchisees (hereinafter the "Franchisees") entered into franchise agreements (the "Franchise Agreements") with the City.   *See* Pls.' Ex. 10-14 (Franchise Agreements).   The Franchise Agreements permitted the Franchisees to, among other things, collect, transport, and dispose of solid waste from locations within the City for twenty years.   As explained in the Court's Preliminary Injunction Order, the Franchise Agreements granted the Franchisees the right to dispose

---

[2]   Plaintiffs' only claim against the individual defendants is contained in Count 6, which alleges they violated the City Charter by failing to convene a hearing with Plaintiffs before enacting the Flow Control Ordinance.

[3]   While the underlying facts are not controverted, the parties vigorously dispute the application of the law to the facts.

of the solid waste it collected at any authorized landfill. Preliminary Injunction Order, Jan. 31, 2012, ECF No. 53.

In December 2011, the Dallas City Council passed the Flow Control Ordinance. It was to take effect January 2, 2012. *See id.* (providing a background of the Flow Control Ordinance). Among other things, the Flow Control Ordinance mandated that all waste collected within the City had to be disposed of at a City landfill.[4]

Plaintiffs filed this suit to permanently enjoin the City from enforcing the Flow Control Ordinance. In the interim, Plaintiffs sought to preliminarily enjoin the City from enforcing it until its claims were finally resolved. After a hearing on Plaintiffs' request for a preliminary injunction, this Court preliminarily enjoined the City from enforcing the Flow Control Ordinance and concluded that: (1) Plaintiffs were likely to succeed on the merits of their Contract Clause claim against the City; (2) Plaintiffs would suffer irreparable harm if the Flow Control Ordinance took effect; (3) the balance of equities favored Plaintiffs; and (4) a preliminary injunction was in the public interest. *See generally* Preliminary Injunction Order, Jan. 31, 2012, ECF No. 53.[5]

Instead of immediately appealing the preliminary injunction order, the City agreed that it would be more efficient to have the case fully resolved first. *See* Joint Report 4, ECF No. 55. The parties agreed to submit their case on written submissions. *Id.* Having considered the pleadings, the evidence, and the applicable law, the Court finds that Plaintiffs have satisfied their burden for obtaining a permanent injunction.

---

[4] The Flow Control Ordinance requires the Franchisees to take solid waste to either the Bachman Transfer Station or McCommas Bluff landfill. *See* Pls.' Ex. 1 (Flow Control Ordinance).

[5] Because of time constraints, the Court only addressed Plaintiffs' Contract Clause claim at the preliminary injunction stage.

## II.     STANDING

### A.     Franchisee Plaintiffs

Before addressing the merits, the Court must first resolve Defendants' standing objections. Defendants argue that certain of the Franchisees lack standing because their names in the complaint do not match how they are identified in the Franchise Agreements. *See* Defs.' Resp. Opp'n Perm. Inj. 8, 14, ECF No. 73. Defendants also contend that all the Franchisees have failed to demonstrate a specific and immediate injury. *Id.* at 15, 19.

Standing "addresses the question of who may properly bring suit in federal court." *Inclusive Cmtys. Project, Inc. v. Tex. Dept. of Hous. & Cmty. Affairs*, No. 3-08-CV-0546-D, 2008 WL 5191935, at *2 (N.D. Tex. Dec. 11, 2008). Under the standing doctrine, a plaintiff must establish that it has suffered an "injury in fact," the injury is "fairly traceable" to the defendant's action, and it is "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An "injury in fact" must be "concrete and . . . actual or imminent, not conjectural or hypothetical." *Id.* at 560. In the context of injunctions, the plaintiff must further show that it is likely to suffer future injury as a result of a defendant's conduct, and that the relief requested will prevent that future injury. *See Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992). However, a court may find standing if the injury is accompanied by any continuing, present adverse effects. *Id.*

Defendants first argue that three of the five Franchisees—Bluebonnet Waste Control, Inc., Waste Management of Texas, Inc., and Allied Waste System, Inc.—cannot prove an injury because, while they allege they are Plaintiffs, they are not the Franchisees identified in the pertinent Franchise Agreements. *See* Defs.' Resp. Opp'n Perm. Inj. 8, 14, ECF No. 73. A variance in a party's pleading

4

and its proof may be fatal to recovery. *See Dougherty v. Robb*, 5 S.W.2d 582, 583 (Tex. Civ. App.—San Antonio 1928, writ dism'd). Courts generally find a variance fatal when there is a difference in pleading and proof as to the names of the parties to a contract. *See W. Tex. Utils. Co. v. Pirtle*, 444 S.W.2d 202, 204 (Tex. Civ. App.–Eastland 1969, no writ). However, if the difference neither surprises nor misleads the party sought to be charged, it is immaterial. *See Cahoon v. Thomas*, 258 S.W. 499, 500 (Tex. Civ. App.—San Antonio 1924, writ dism'd w.o.j.).

Here, the variance between the identity of the Franchisees in the Franchise Agreements and their names as identified in the lawsuit is nonfatal. The City points out that this lawsuit names Bluebonnet Waste Control, Inc. as a party, but its Franchise Agreement references, in various parts, Blue Bonnet Waste, Inc. *See* Defs.' Resp. Opp'n Perm. Inj. 8, 14, ECF No. 73; *compare* Pls.' Am. Compl. 1, ECF No. 36 *with* Pls.' Ex. 10 (Bluebonnet Franchise Agreement), at App. 81. The City also points out that this action lists Allied Waste System, Inc. as a plaintiff while the Franchise Agreement identifies Allied Waste Services, Inc. as a contracting party. *See* Defs.' Resp. Opp'n Perm. Inj. 8, 14, ECF No. 73; *compare* Pls.' Am. Compl. 1, ECF No. 36, *with* Pls.' Ex. 13 (Allied Franchise Agreement), Exhibit B. Finally, the City alleges that Waste Management of Texas, Inc. ("WMTI") has no standing because its Franchise Agreement names "Waste Management Inc." *See* Defs.' Resp. Opp'n Perm. Inj. 8, 14, ECF No. 73; *compare* Pls.' Am. Compl. 1, ECF No. 36, *with* Pls.' Ex. 14 (WMTI Franchise Agreement), Exhibit B.

The Court finds Defendants' arguments unavailing. First, the City has enforced the Bluebonnet Franchise Agreement against Bluebonnet Waste Control, Inc. ("Bluebonnet"), the Allied Franchise Agreement against Allied Waste System, Inc. ("Allied"), and the WMTI Franchise

Agreement against WMTI for the last five years. *See City Ry. Co. v. Citizens St. R.R. Co.*, 166 U.S. 557, 558 (1897) (finding a party's conduct constitutes acceptance of a franchise agreement).

In addition, the Bluebonnet Franchise Agreement and WMTI Franchise Agreement identify these Franchisees by both names throughout the document. On the acceptance page of Bluebonnet's Franchise Agreement, Bluebonnet Waste Control, Inc. signed the agreement even though Blue Bonnet Waste, Inc. is the entity identified in the opening paragraph of the document. *See* Pls.' Ex. 10 (Bluebonnet Franchise Agreement), at App. 44, 81. Similarly, the WMTI Franchise Agreement lists Waste Management, Inc. in the signature block, but Waste Management of Texas Inc. is the entity that signed it. *See* Pls.' Ex. 14 (WMTI Franchise Agreement), Exhibit B. The Allied Franchise Agreement only identifies Allied Waste Services, Inc. *See* Pls.' Ex. 13 (Allied Franchise Agreement). However, the evidence indisputably shows it is known in the industry as both "Allied Waste Services, Inc." and "Allied Waste System, Inc." *See* Pls. Ex. 34 (Stefkovich Decl.), ¶ 5. For these reasons, there is little risk that the City is surprised that the named Plaintiffs are the Franchisees seeking judicial resolution to enforce the Franchise Agreements against the City. *See Cahoon*, 258 S.W. at 500; *see also City Ry. Co.*, 166 U.S. at 558. Accordingly, the Court finds that Waste Management of Texas, Inc., Bluebonnet Waste Control, Inc., and Allied Waste System, Inc. are the parties referenced in their respective Franchise Agreements with the City.[6]

---

[6] Defendants have also separately filed objections to considering evidence submitted by Plaintiffs in their reply brief. *See* Defs.' Objections, ECF No. 75. Defendants object to Plaintiffs' additional evidence because the parties agreed that no additional evidence would be permitted. *See id.* at 1. Plaintiffs' additional evidence concerns their identities in the Franchise Agreements and replies to Defendants' standing argument. Plaintiffs argue that the Court can take judicial notice of City ordinances, can address Defendants' standing arguments on the existing evidentiary record, and in the alternative, the Court may take additional evidence to address the standing issues. *See generally* Pls.' Resp. Defs.' Objections, ECF No. 76. Defendants do not contend they are surprised by Plaintiffs' additional evidence, nor do they seek to present additional information in response. In the event that the additional evidence is permitted, Defendants request the Court to note that the Franchise Agreements are null and void because they were not executed in compliance with the contract. *See* Defs. Objections 7-8, ECF No. 75. The Court finds Defendants will suffer no prejudice by the

The City further alleges that all the Franchisees lack standing because they have failed to prove a specific and imminent injury. *See* Defs.' Resp. Opp'n Perm. Inj. 15, 19, ECF No. 73. Economic loss is the "quintessential injury" contemplated by the standing doctrine. *Tex. Dem. Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (citing *Barlow v. Collins*, 397 U.S. 159, 163-64 (1970)). When a plaintiff faces the threat of prosecution for non-compliance with an ordinance, the Fifth Circuit finds the injury-in-fact element satisfied. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 543-44 (5th Cir. 2008).

Here, Plaintiffs have shown that the Franchisees face prosecution for non-compliance and stand to suffer substantial economic loss if the Flow Control Ordinance goes into effect. Under the Franchise Agreements, the Franchisees have a right to dispose of the solid waste they collect at authorized landfills inside or outside the Dallas city limits. *See* Pls.' Exs. 10-14 (Franchise Agreements); Preliminary Inj. Order 9-11, Jan. 31, 2012, ECF No. 53. The Flow Control Ordinance changes that by requiring the Franchisees to dispose of solid waste only at City-owned landfills. *See* Pls.' Ex. 1 (Flow Control Ordinance). The Franchisees demonstrate that the Flow Control Ordinance will significantly increase their operating costs because it will require them to drive longer distances to get to City-owned facilities and pay higher disposal rates. *See* Pls.' Ex. 36 (Brown Decl.), ¶ 9; Pls.' Ex. 41 (Branch Decl.), ¶ 6. Additionally, two Franchisees stand to lose more than $13 million in revenue because they obtain revenue from landfills they own outside the City, which will see reduced loads once the Flow Control Ordinance takes effect. *See* Pls. Ex. 41 (Branch Decl.), ¶ 6. The Franchisees immediately face prosecution if they continue their current practice of hauling solid

---

consideration of the new evidence. As a result, Defendants' objections are overruled. For the same reasons the Court finds Plaintiffs are proper parties, Defendants' objection that the Franchise Agreements were not executed in compliance with their terms fails.

waste to non-City owned landfills once the ordinance is enacted.  *See* Pls.' Ex. 1 (Flow Control

Ordinance), at 3-4; Pls.' Ex. 7 (Municipal Code), at App. 22-23.  Based on the foregoing, the Court

finds that Franchisees satisfy the injury-in-fact requirement.

Even though Defendants do not argue otherwise, the Court finds that the Franchisees also

satisfy the causation and redressability elements under *Lujan*.  The significant threat of economic

loss or criminal prosecution is "directly traceable" to the City's intention to enforce the Ordinance.

*See* Pls.' Ex. 20 (Nov. 14, 2011 Meeting), at 5:17-21, 6:10-20; Pls.' Ex. 27 (Nix Dep.), at

201:16-202:13.  Furthermore, enforcement of the Ordinance will continue to cause the Franchisees

financial loss and subject them to the possibility of criminal prosecution.  An injunction would

prevent that future injury. Based on the foregoing, the Court finds that Franchisee Plaintiffs have

standing to bring their claims.

### B.       Associational Plaintiffs

The City alleges that Plaintiffs National Solid Wastes Management Association ("NSWMA")

and Business Against Flow Control ("BAFC"), associational plaintiffs, lack standing because

individual participation of their members is required.  *See* Defs.' Resp. Opp'n Perm. Inj. 15-16, ECF

No. 73.

An association has standing to bring suit on behalf of its members when: "(a) its members

would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are

germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver.*

*Comm'n*, 432 U.S. 333, 343 (1977).  The final prong asks whether individual plaintiff participation

is required because of the nature of the underlying claim and the relief sought.  *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).

The City's objection to the associational plaintiffs' participation is directed at the final prong. According to the City, participation of individual associational members is necessary because each is required to prove that it subjectively relied on its "right to dispose" of solid waste to succeed on a Contract Clause claim.  *See* Defs.' Resp. Opp'n Perm. Inj. 16, ECF No. 73.  Under this element of the Contract Clause, a litigant must establish a substantial impairment of a contractual relationship.  *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244-45 (1978).  To determine if a litigant has met his burden on this element, the Court looks to the parties' reasonable expectations at the time of contracting.  *See United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 627 (5th Cir. 2010).

The City argues that the Franchisees had no basis to believe they had a right to dispose of waste outside of Dallas because they knew the Franchise Agreements were subject to its police power and their industry was heavily regulated.  *See* Defs.' Resp. Opp'n Perm. Inj. 16-17, 19, ECF No. 73.  But, the reasonable expectation inquiry does not rely on the parties' subjective reliance. Instead, the analysis focuses on whether the subject matter of the contract was objectively subject to regulation at the time of enactment and whether the *terms* of the contract "suggest that [the parties] knew [their] contractual rights were subject to alteration" by future state regulation.  *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983).  As explained in the preliminary injunction order, the terms of the Franchise Agreements grant the Franchisees the right to dispose of solid waste at any authorized landfill.  *See* Preliminary Injunction Order 14-16, Jan. 31, 2012, ECF No. 53.  The evidence also establishes that regulation at the City level was minimal,

subject only to lawful, necessary exercises of the police power and, at a minimum, the Flow Control

Ordinance increases costs on the Franchisees. *See id.* As a result, individual members need not

prove that they each subjectively relied on the "right to dispose."

Additionally, the injunctive relief sought by the associational plaintiffs does not require

individual participation. In *Warth*, the Supreme Court concluded:

> [W]hether an association has standing to invoke the court's remedial
> powers on behalf of its members depends in substantial measure on the
> nature of the relief sought. If in a proper case the association seeks a
> declaration, injunction, or some other form of prospective relief, it can
> reasonably be supposed that the remedy, if granted, will inure to the
> benefit of those members of the association actually injured.

422 U.S. at 511. Given that the associational plaintiffs seek to enjoin enforcement of the Flow

Control Ordinance, the Court finds it reasonable to conclude that such a remedy will inure to the

benefit of those members actually injured. *See Tex. Dem. Party*, 459 F.3d at 587-88 (finding a

political candidate need not participate in a suit because an injunction will "inure" to his benefit).

Plaintiffs have shown that associational member Champion Waste Services, LLC

("Champion") has an identical franchise agreement with the City, which supports the request for an

injunction. *See* Pls.' Ex. 29 (McCord Dep.), at App. 9, 13-16, 23-25. In *Association of American

Physicians & Surgeons, Inc. v. Texas Medical Board*, 627 F.3d 547, 552 (5th Cir. 2010), the Fifth

Circuit declared that "as long as resolution of the claims benefits the association's members and the

claims can be proven by evidence from representative injured members, without a fact-intensive

inquiry, the participation of those individual members will not thwart associational standing." An

injunction granted to associational plaintiffs will inure to the benefit of Champion and other

individual members with similar franchise agreements. *See Warth*, 422 U.S. at 511 Therefore, it

is unnecessary to conduct a "fact-intensive inquiry" for the other associational members. *See Am. Physicians*, 627 F.3d at 552.

Based on the foregoing, the Court finds that the associational plaintiffs have standing in the instant action.

## III.   PERMANENT INJUNCTION

Plaintiffs seek a permanent injunction against the City based on their claims that (1) the City violated the Contract Clause of the United States Constitution; (2) the City violated the Due Course of Law Clause of the Texas Constitution; (3) the City violated its City Charter; (4) the Flow Control Ordinance is void for vagueness; and (5) the Flow Control Ordinance is preempted by state law.

### A.   Legal Standard

The standard for issuing a permanent injunction is "essentially the same" as for a preliminary injunction. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). To prevail on a permanent injunction, the movant must show: (1) actual success on the merits of its claims; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010) (citing *Harris Cnty. v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999)).

The decision to grant or deny permanent injunctive relief is left to the sound discretion of the district court. *See Lemon v. Kurtzman*, 411 U.S. 192, 200-01 (1973). A permanent injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777

F.2d 992, 997 (5th Cir. 1985). Even when a movant establishes the four requirements, the decision to grant or deny a permanent injunction remains in the court's discretion. *Lemon*, 411 U.S. at 200-01.

### B.      Actual Success on the Merits

Based on the evidence and applicable law, the Court concludes that Plaintiffs have proven that the City violated the Contract Clause of the United States Constitution, the Due Course of Law Clause of the Texas Constitution, and its City Charter.[7]  The Court concludes that Plaintiffs have failed to show that the Flow Control Ordinance is void for vagueness or preempted by state law.

### 1.      Contract Clause

Nothing presented by Defendants in their trial submissions alters the Court's previous conclusion that the Flow Control Ordinance violates the Contract Clause. For the reasons set forth at length in the Court's Preliminary Injunction Order, the Court concludes Plaintiffs have proven by a preponderance of the evidence that the City violated the Contract Clause of the United States Constitution. *See* Preliminary Injunction Order, Jan. 31, 2012, ECF No. 53.

### 2.      Due Course of Law

Plaintiffs argue that the Flow Control Ordinance violated the Texas Constitution because it improperly impaired Plaintiffs' vested rights under the Franchise Agreements. *See* Pls.' Br. Supp. Perm. Inj. 8-14, ECF No. 68. The Due Course of Law Clause provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. The Texas Supreme Court

---

[7]    While the Court concludes that the City violated the City Charter, this claim is dismissed as moot for the reasons discussed below.

has held that a city may not impair vested rights unless it properly acts according to its police powers. *See Tex. Power & Light Co. v. City of Garland*, 431 S.W.2d 511, 516-18 (Tex. 1968). A city that exercises its police powers to advance its own economic or proprietary interests does not properly act pursuant to this power. *Id.* at 518.

To begin, the Due Course of Law Clause protects only vested rights. *See State v. Morales*, 869 S.W.2d 941, 945 (Tex. 1994). A right is "vested" when it has some definite rather than merely potential existence. *See City of La Marque v. Braskey*, 216 S.W.3d 861, 864 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). In *Hudson v. Cuero Land & Emigration Co.*, 47 Tex. 56, 65 (1877), the Texas Supreme Court found that property owners who had a right to operate a ferry franchise possessed a vested right to do so. Such a right, the court determined, "could only be divested by due course of law." *Id.*; *see also City of Baird v. W. Tex. Utils. Co.*, 174 S.W.2d 649 (Tex. Civ. App.—Eastland 1943, writ ref'd) (finding a vested property right in a franchise to provide electricity which may not be impaired). In *Texas Power & Light Co.*, the City of Garland ("Garland") granted a non-exclusive franchise to Texas Power & Light Co. ("TP&L") to use streets and public places to construct power lines and deliver electricity. *See* 431 S.W.2d at 513-14. The Texas Supreme Court recognized that TP&L obtained a vested right in the franchise agreement and such right could not be "taken under a pretense of regulation." *See id.* at 518.

As explained in detail in the Court's Preliminary Injunction Order, the terms of the Franchise Agreements grant the Franchisees the right to dispose of solid waste at any authorized landfill. *See* Preliminary Inj. Order, Jan. 31, 2012, ECF No. 53. Because the City granted that right, it may not be impaired by an arbitrary or unreasonable exercise of the City's police powers. *See Spann v. City of Dallas*, 235 S.W. 513, 516-17 (Tex. 1921). An unreasonable exercise of the police power occurs

13

when the "social necessity the law is to serve is not a sufficient justification of the restriction of liberty involved." Tex. Const. art. 1, § 19, Interpretive Commentary (West 2007). "A law which assumes to be a police regulation but deprives the citizen of the use of his property under the pretense of preserving the public health, safety, comfort or welfare, when it is manifest that such is not the real object and purpose of the regulation, will be set aside." *Spann*, 235 S.W. at 515.

The City proffers a number of justifications for enactment of the Flow Control Ordinance, including to (1) deter illegal dumping of solid waste, (2) increase recycling, (3) ensure the safe and proper handling of solid waste within the city, (4) provide for cost-efficient solid waste management, and (5) facilitate the development of data on solid waste management. *See* Defs.' Resp. Opp'n Perm. Inj. 26-29, ECF No. 73. The City also asserts that the Flow Control Ordinance will improve the air quality, help the City implement green technologies, and create new jobs. *See* Defs.' Resp. Opp'n Perm. Inj. 9, ECF No. 73.[8]

The Court finds that, despite the City's proffered justifications, the evidence demonstrates that it implemented the Flow Control Ordinance to raise revenue to advance its economic and proprietary interests at the expense of the Franchisees' rights. This is an unreasonable exercise of its police powers. *See Tex. Power & Light Co.*, 431 S.W.2d at 518.

This conclusion is supported by the overwhelming weight of the evidence. First, Sanitation Director Nix made a series of admissions that shows the purported justifications were not the true

---

[8] Throughout its brief, the City cites *United Haulers Association, Inc. v. Oneida-Hermiker Solid Waste Management Authority*, 550 U.S. 330, 344 (2007). In *United Haulers*, the question before the Supreme Court was whether a city's flow control ordinance violated the Dormant Commerce Clause. *See id.* at 334. The Supreme Court upheld the flow control ordinance, in part, because any burdens it had on interstate commerce did not clearly exceed the public benefits. *See id.* at 346-47. Some of the benefits cited by the Supreme Court in that case included addressing price fixing, organized crime in the waste hauling business, and violations of state regulations. *See id.* at 335-36. This case, however, is not one asserted under the interstate commerce clause, nor was the City acting to address any "crisis." Therefore, *United Haulers* does not control the result here.

motivation. *See* Pls.' Ex. 27 (Nix Dep.).  She admitted that the Flow Control Ordinance was not necessary to address illegal dumping issues; that the Flow Control Ordinance, while valuable, was not necessary to increase the recycling rate in Dallas; that no landfills were currently operating in the City without a permit; that solid waste within the City limits was currently being handled in an environmentally sound and cost-efficient manner; and that she could not identify any portion of the Flow Control Ordinance that would help generate data about commercial waste. *See id.* at 43:2-44:23, 45:17-23, 51:17-54:21, 57:8-13.  This evidence undermines the argument that the Flow Control Ordinance was implemented to improve air quality, implement "green" technologies, and provide new jobs.

In addition, Mayor Rawlings and other City Council members heavily emphasized the revenue-raising aspects of the Flow Control Ordinance. *See generally* Pls.' Ex. 3 (City Council Meeting, Sept. 28, 2011); Preliminary Inj. Order 18, Jan. 31, 2012, ECF No. 53.  Mayor Rawlings acknowledged that the Flow Control Ordinance was a "business revenue issue." *See* Pls.' Ex. 3 (City Council Meeting, Sept. 28, 2011).  He further added: "[T]here's 700 to 900 . . . thousand tons of commercial waste leaving the City of Dallas and people are making money off of that.  Corporations outside of Dallas are making money off of that.  That could mean $15 to $18 million of revenue for the City coffers. . . ." *Id.*  Other City Council members expressed the same sentiment as Mayor Rawlings.  *Id.* ("We need the funds, and I think it's a good way to get it.") (comment by Council member Kadane); ("It's a valuable commodity.  It's a valuable asset to anyone and it's big business.") (comment by Council member Allen).

Finally, the City also considered the Flow Control Ordinance contemporaneously with the Southeast Oak Cliff Investment Fund, further leading the Court to conclude that it was primarily a

revenue-raising measure. *See* Pls.' Ex. 2 (City Council Resolution). In essence, a vote for the Flow Control Ordinance amounted to a vote for the Southeast Oak Cliff Investment Fund because a significant portion of the revenue raised from diverting solid waste to the City's landfills would go into that fund. *See* Pls.' Ex. 3 (City Council Meeting, Sept. 28, 2011). That fund was designed to provide economic investments in the south Dallas area. Mayor Rawlings made the connection explicit when he argued:

> I'm not going to support . . . a manana approach to this thing. I'm just not going to do it. I'll tell you why. Because . . . those citizens have waited long enough in this city for us to get them money. We've got real money here. A million dollars. We could clean up the land. We could have a grocery store quickly. And for me, as the mayor, to sit here and say we need to study something longer, I'm telling you, I just don't buy it . . . . This is a moment of truth for the city of Dallas to decide whether we're going to find something that improves southern Dallas or we are just going to talk a good game.

*Id.*

Accordingly, the Court concludes that the City enacted the Flow Control Ordinance to advance its own economic and proprietary interests.

Not all ordinances designed to raise revenue are invalid. An ordinance designed to raise revenue to address a fiscal or other significant problem may be proper under the police power. *See Spann*, 235 S.W. at 515; *Campbell v. Davenport*, 362 F.2d 624, 628-29 (5th Cir. 1966); *see also Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006). However, that is not the case here because the City did not act to address any fiscal problem. The evidence establishes that, in the years immediately preceding passage of the ordinance, the Department of Sanitation Services estimated its net revenues in fiscal years 2009, 2010, and 2011 to be $17.7 million, $14.5 million, and $15.5 million, respectively. *See* Pls.' Ex. 15 (Briefing to City Council), at 42; Pls.' Ex. 16

(Sanitation Services 2010 Proposed Budget), at 11; Pls.' Ex. 17 (Sanitation Services 2011 Proposed Budget), at 5. Moreover, the evidence shows the Department of Sanitation Services projects net revenue in 2012 to be around $10 to $11 million. *See* Pls.' Ex. 27 (Nix Dep.), at 35:16-36:5 According to the City, that number stands to rise to between $15 and $18 million, with up to $1 million going to the Southeast Oak Cliff Investment Fund each year once the Flow Control Ordinance takes effect. *See* Pls.' Ex. 18 (The Green Path for Dallas' Trash Briefing to City Council, Sept. 7, 2011), at 18-19; *see also* Pls.' Ex. 3 (City Council Meeting, Sept. 28, 2011) (comments by Mayor Rawlings). In addition, as previously discussed in the Court's Preliminary Injunction Order, the City does not have a plan to implement flow control—"in plan or effect"—for the next fifty years. *See* Pls.' Ex. 19 (Waste Management Plan), at 3. Accordingly, the Court finds the Flow Control Ordinance was not enacted to address any fiscal or other significant problem.

This case is similar to *Texas Power & Light Co.* In that case, the city of Garland granted a non-exclusive franchise to TP&L to use its streets and public places to construct power lines and provide electricity. *See Tex. Power & Light Co.*, 431 S.W.2d at 513. After granting this franchise, Garland constructed its own electric plant and engaged in competition with TP&L. *See id.* When TP&L applied for a permit to provide electricity to a new apartment complex, Garland denied the application because it intended "to serve [the] area," through its electricity plant. *Id.* On appeal, the Texas Supreme Court determined that Garland violated the Due Course of Law Clause of the Texas Constitution because Garland denied the permit for commercial competitive reasons, not in the reasonable exercise of its police power. *See id.* at 517-18.

The same is true here. The City passed the Flow Control Ordinance to increase its revenues by requiring Plaintiffs to use its landfills. This has the effect of taking money from those Franchisees

who own landfills or who pay to dispose at less expensive landfills and transferring those funds to itself. The only significant difference between the City's actions and those taken by Garland is that the City in this case acted more discreetly by listing other purported justifications for enacting the Ordinance, whereas Garland conceded that it acted solely to advance its "economic and proprietary interests." *Compare id.* at 518, *with* Pls.' Ex. 1 (Flow Control Ordinance). That the acted more discreetly does not matter when it is manifest that the true purpose is different. *Spann*, 235 S.W. at 515.

Based on the foregoing, the Court finds that the City violated the Due Course of Law provision of the Texas Constitution.

### 3. Violation of the City's Charter

The Court now evaluates Plaintiffs' claims that the City violated its Charter. According to Plaintiffs, the Franchisees were entitled to a hearing before the City enacted the Flow Control Ordinance because it stripped them of the right to dispose of solid waste at any authorized landfill as provided for in the Franchise Agreement. *See* Pls.' Br. Supp. Perm. Inj. 37-40, ECF No. 68. Defendants argue that the Flow Control Ordinance did not affect any rule or regulation, and even if it did, Defendants provided Plaintiffs a fair hearing. *See* Defs.' Resp. Opp'n Perm. Inj. 40-42, ECF No. 73.

While broad discretion is given to a city in exercising its powers, a city must respect the express provisions of its charter. *See City of Austin v. Thompson*, 219 S.W.2d 57, 59 (Tex. 1949). In other words, a city may not "perform a governmental function in any manner contrary to the express provisions of its charter." *Willman v. City of Corsicana*, 213 S.W.2d 155, 157 (Tex. Civ. App.—Waco 1948, writ granted), *aff'd*, 216 S.W.2d 175 (Tex. 1949). Generally, courts construe

city charter provisions according to the rules governing statutory interpretation. *See Rossano v. Townsend*, 9 S.W.3d 357, 363 (Tex. App.—Houston [14th Dist.] 1999, no pet.). "[I]f any fair, substantial and reasonable doubt exists as to any power, it is to be resolved against the corporation and the power denied." *Tex. River Barges v. City of San Antonio*, 21 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied).

Chapter 14, Section 7 of the Dallas City Charter provides that "[t]he city council shall provide for a fair hearing to any person, firm, corporation, or other business entity enjoying a public service franchise in the City of Dallas, prior to the change in the rates, rules, or regulations applicable to such franchise." Pls.' Ex. 9 (Dallas City Charter), at App. 108. Defendants argue that the Flow Control Ordinance does not affect any "rule" or "regulation" applicable to the Franchisees because their respective Franchise Agreements did not grant them the right to dispose of waste in any particular location. *See* Defs.' Resp. Opp'n Perm. Inj. 41.

As explained in the Court's Preliminary Injunction Order, the Franchise Agreements granted the Franchisees the right to dispose of solid waste at any authorized landfill inside or outside the City limits. *See generally* Preliminary Inj. Order, Jan. 31, 2012, ECF No. 53. The Flow Control Ordinance mandated that the Franchisees dispose of solid waste only at City-owned landfills. *See* Pls.' Ex. 1 (Flow Control Ordinance). Therefore, the Flow Control Ordinance changed a "rule" and a "regulation" of the Franchise Agreements. This finding is corroborated by Director Nix's admission that the Flow Control Ordinance affected a "rule" applicable to Franchisees. *See* Pls.' Ex. 27 (Nix Dep.), at 227:5-228:20 ("[T]he flow control ordinance affected a rule that the franchisees were obliged to follow.").

19

Because the Court finds that the Flow Control Ordinance changed a "rule" or "regulation" applicable to Franchisees, the City Charter required the City to convene a hearing for the Franchisees before enacting the Flow Control Ordinance. Defendants argue that making city council meetings and city officials' staff meetings open to the general public satisfied the "fair hearing" requirement because Plaintiffs appeared and argued against the Flow Control Ordinance in both settings. *See* Defs.' Resp. Opp'n Perm. Inj. 41, ECF No. 73. Plaintiffs assert that the Charter contemplates a hearing where the Franchisees are able to present evidence and develop testimony before a neutral decision-maker regarding this specific issue. *See* Pls.' Br. Supp. Perm. Inj. 38-39, ECF No. 68.

The Court must decide whether the City provided a "fair hearing" according to the City Charter. To make this determination, the Court must determine the meaning of "fair hearing" as contemplated by the State Legislature. *See Rossano v. Townsend*, 9 S.W.3d 357, 363 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Our interpretation must be fair, rational, reasonable, and with a view accompanying the enacting body's intent and purpose."). The primary rule in construing any statute is to give meaning to the intent of the legislature. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009) (citing Tex. Gov't Code § 312.005). In doing so, the Court relies on the plain meaning of the text unless a different meaning is provided, or the plain meaning leads to absurd results. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008). The Court presumes all of the words in a statute were included with a purpose in mind. *See In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008).

The City Charter provides that a franchisee is entitled to receive a "fair hearing" prior to enacting new rules or regulations affecting its franchise. Pls.' Ex. 9 (Dallas City Charter), at App. 108. Because the State Legislature chose to include the "fair hearing" provision in the Charter, the

Court presumes it has a specific meaning.  *See In re Caballero*, 272 S.W.3d at 599.  A fair hearing has to provide more process than that afforded to non-franchisee members of the general public, otherwise there would be no difference between it and the ordinary and normal meetings conducted by the City.  The Franchise Agreements provided the Franchisees the right to dispose of solid waste at any authorized facility.  The Flow Control Ordinance revoked that right.  As such, the City Charter required the City to provide the Franchisees a hearing on this specific issue before enacting the Flow Control Ordinance.  Because Defendants did not, they violated the City Charter.

However, the Court concludes this claim is moot.  Plaintiffs assert this claim against the Mayor and the Council members in their official capacity.  *See* Pls.' Am. Compl. ¶¶ 61-62, ECF No. 36.  Defendants argue that official immunity bars this claim against the individual defendants because it is redundant to the claims against the City.  *See* Defs.' Resp. Opp'n Per. Inj. 17-18, 50, ECF No. 73.

Where a plaintiff alleges violations of a state law, the rules of immunity of that state apply. *See Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777-78 (7th Cir. 1991) (*citing Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).  Since Plaintiffs allege a state law cause of action against the individual defendants, Texas law on official immunity applies.  *See id.*  Under Texas law, a defendant bears the burden to establish that official immunity applies.  *Perry v. Tex. A & I Univ.*, 737 S.W.2d 106, 110 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.).  Government officials "are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority."  *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)*.*

The individual defendants argue that *Kentucky v. Graham*, 473 U.S. 159 (1985), requires their dismissal. *See* Defs.' Resp. Opp'n Perm. Inj. 17-18, ECF No. 73. In *Graham*, the Supreme Court held that plaintiffs pursuing § 1983 claims against individual defendants in their official capacity must look to the government entity itself for recovery. 473 U.S. at 166. Here, unlike in *Graham*, Plaintiffs seek to enjoin the individual defendants for violating the City's Charter, not for violating federal civil rights. *See* Pls.' Am. Compl. ¶¶ 59-62, ECF No. 36. Thus, *Graham* is not controlling. Instead, Texas permits suits against public officials in their official capacity when the relief sought is to enjoin the officials from violating the law in the future. *See Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620, 623 (Tex. 2011); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372-73 (Tex. 2009). This is what Plaintiffs seek. They request that the individual defendants be enjoined from enacting the Flow Control Ordinance unless and until they permit the hearing required by the City Charter. *See* Pls.' Am. Compl. ¶ 62, ECF No. 36.

Since the Court has previously declared the Flow Control Ordinance unconstitutional, Plaintiffs' request to enjoin the individual defendants from enacting the Flow Control Ordinance unless and until they have a hearing is moot. Therefore, the claim against Mayor Mike Rawlings, and City Council members Pauline Medrano, Tennell Atkins, Dwaine Caraway, Monica Alonzo, Carolyn Davis, Jerry Allen, Linda Koop, and Angela Hunt in their official capacity is dismissed.

4.    Vagueness

Plaintiffs contend that the Flow Control Ordinance is unconstitutionally vague under the federal and state constitution. *See* Pls.' Br. Supp. Perm. Inj. 14-15, ECF No. 68. Plaintiffs argue it is vague because it fails to define key terms, including "solely recyclable material," "processing," "generated," and "found," and because it grants Director Nix unbridled discretion in enforcing the

ordinance. *See id.* at 15-17. Based on these failures, Plaintiffs argue the Flow Control Ordinance fails because it is void for vagueness under the federal Constitution and it violates the Due Course of Law provision of the Texas Constitution. *See id.* at 15-16. The Court will first analyze the ordinance under the United States Constitution and then examine it under the Texas Constitution.

a.      Due Process Clause

Plaintiffs do not specify whether they challenge the Flow Control Ordinance on an as-applied or facial basis. Because a party's designation of how it is proceeding is not controlling, the Court will first determine the nature of their claim. *See Century Sur. Co. v. Hardscape Constr. Specialties Inc.*, 578 F.3d 262, 267 (5th Cir. 2009); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617-18 (Tex. 1986). A claim is an as-applied challenge when it is based on the unconstitutional application of the statute to the plaintiff's conduct. *See Voting for Am., Inc. v. Andrade*, No. 12–40914, 2012 WL 4373779, at *3 n.9 (5th Cir. Sept. 26, 2012) (noting that to present an as-applied challenge plaintiff must present actual facts, not vague fears and rumors). Plaintiffs do not contend that the Flow Control Ordinance has been applied to them. Nor could they take such a position given that the ordinance was enjoined before taking effect. Therefore, Plaintiffs' claim is that the Flow Control Ordinance is void for vagueness on its face.

Facial vagueness challenges are "disfavored for several reasons," including that they often "rest on speculation." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Plaintiffs confront a heavy burden when advancing a facial constitutional challenge to an ordinance. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) ("Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'") (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). For vagueness

23

challenges under the due process clause, a plaintiff must demonstrate "that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).  Before considering these various applications, the Court must first apply the ordinance to a party's conduct.  *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008).

Vagueness may invalidate a statute or ordinance if it: (1) "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement."  *See United States v. Escalante*, 239 F.3d 678, 680 (5th Cir. 2001) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion)).  Plaintiffs contend that the Flow Control Ordinance fails under both prongs.

i.    Notice

Plaintiffs first argue that the Flow Control Ordinance is vague because it fails to define essential terms needed to provide appropriate notice.  *See* Pls.' Br. Supp. Perm. Inj. 16-18, ECF No. 68.  Plaintiffs argue that the Flow Control Ordinance does not define "important terms for determining [its] application," including the terms "solely recyclable material," "processing," "generated," and "found."  *See id.*

Plaintiffs argue that Director Nix's interpretation of "processing" is at odds with the plain wording of the Flow Control Ordinance.  *See* Pls.' Br. Supp. Perm. Inj. 17, 22, ECF No. 68.  Plaintiffs explain that Section 18-10(1)(B) does not explicitly provide that waste must go to a City-owned facility for "processing."  *See id.*  Plaintiffs further state that Director Nix, in response to a question asked at her deposition, understands the provision to mean that all waste was to go to City-owned facilities whether for disposal or "processing."  *See id.*

The Court finds this argument unpersuasive.  At her deposition, Director Nix stated that the term "processing" typically "refers to some manipulation of the waste product to some other form." *See* Pls.' Ex. 27 (Nix Dep.), at 127:4-7.  Plaintiffs do not dispute that this is a proper definition of "processing."  Therefore, "processing" is a term capable of being interpreted in reference to common understanding and practice.  *See Int'l Soc. for Krishna Consciousness of Hous., Inc. v. City of Hous.*, 689 F.2d 541, 553 (5th Cir. 1982) (finding terms in an ordinance have a "common, well-understood meaning sufficiently plain to put on fair notice those subject to the ordinance.").  Director Nix's understanding of the term does not disturb this conclusion.  Further, a statute is not impermissibly vague merely because it fails to define words used therein.  *See, e.g.*, *United States v. Overstreet*, 106 F.3d 1354, 1358 (7th Cir. 1997).  In addition, Plaintiffs do not argue that the term is impermissibly vague in all applications.  *See Vill. of Hoffman Estates*, 455 U.S. at 497-98.  For these reasons, the Court concludes that Plaintiffs have failed to prove the ordinance is vague for failing to define "processing."

Plaintiffs make a similar complaint about the terms "found" and "generated."  *See* Pls.' Br. Supp. Perm. Inj., 16, 22-23, ECF No. 68.  At a meeting in November 2011, Director Nix was asked whether non-recyclable materials brought into Dallas for recycling were "found" in the City.  *See* Pls.' Ex. 20 (Nov. 14, 2011 Meeting), at 28:11-29:3.  Director Nix responded that she did not know and would seek help to further clarify the term.  *See id.*  On that basis, Plaintiffs ask the Court to find that "generated" and "found" are vague.  *See* Pls.' Br. Supp. Perm. Inj. 16-17, 22-23, ECF No. 68. The Court, however, finds this argument unavailing.  "Generated" and "found" are terms capable of being interpreted in reference to common understanding and practice.  *See Int'l Soc. for Krishna Consciousness*, 689 F.2d at 553.  While the "imagination can conjure hypothetical cases in which

the meaning of these terms will be in nice question," courts are concerned with the "practical criterion of fair notice to those to whom the statute is directed." *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 412 (1950). In addition, Plaintiffs have also failed to prove these terms are impermissibly vague in all applications. *See Vill. of Hoffman Estates*, 455 U.S. at 497-98. Therefore, Plaintiffs have failed to prove the Flow Control Ordinance is vague for failing to define these terms.

Finally, Plaintiffs complain of the definition for "composed solely of recyclable material." *See* Pls.' Br. Supp. Perm. Inj. 17-20, ECF No. 68. The Flow Control Ordinance provides that the Franchisees must dispose of solid waste at City-owned landfills unless the waste is "composed solely of recyclable material." *See* Pls.' Ex. 1 (Flow Control Ordinance). The Flow Control Ordinance vests in Director Nix the authority to define "recyclable material." *See* Pls.' Ex. 7 (Municipal Code), at App. 7. She may define materials or products "suitable for re-use and/or recycling." *Id.* She issued an administrative directive defining "solely recyclable" as "loads containing no more than incidental amounts of non-recyclable materials." *See* Pls.' Ex. 8 (Administrative Directive). This definition is consistent with that provided by the state. *See* 30 Tex. Admin. Code § 328.2(3)(A). Therefore, under the ordinance, "solely recyclable" material is material made up of no more than 10% non-recyclable waste and 4% tramp materials.

Courts "have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretation." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Because of the myriad of issues governmental bodies must direct, it would be impossible to define with mathematical certainty all of the terms of legislation. *See Boyce*

*Motor Lines v. United States*, 342 U.S. 337, 340 (1952) ("[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions.").  If the legislature has "explicitly left a gap for the agency to fill," the agency's interpretation controls unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.  If the delegation is implicit, the agency's interpretation stands unless it is unreasonable. *Id.*  There is no evidence in the record that Director Nix's definition of "solely recyclable material" is arbitrary or capricious, nor does the Court conclude it is manifestly contrary to the Flow Control Ordinance.  In addition, Plaintiffs have not shown these terms are vague in all applications. *See Vill. of Hoffman Estates*, 455 U.S. at 497-98. Therefore, the Court concludes that Plaintiffs' facial attack on the Flow Control Ordinance fails.

ii.     <u>Arbitrary Enforcement</u>

The true focus of Plaintiffs' Due Process challenge appears to target Director Nix's authority to define, or later redefine, terms. *See* Pls.' Br. Supp. Perm. Inj. 17-20, 24, ECF No. 68.  Plaintiffs argue she possesses unbridled authority to define these terms, which violates the second prong of the Due Process Clause because the Flow Control Ordinance authorizes arbitrary or capricious enforcement. *See id.*  In support of this concern, Plaintiffs point to Director Nix's response to a question at a meeting with solid waste haulers where she said "solely recyclable material" means "100% recyclable." *See* Pls.' Ex. 20 (Nov. 14, 2011 Meeting), at 13:1-6, 15:1-3.  That she later formally provided a different definition in the administrative directive is proof, Plaintiffs contend, that she is authorized to enforce the law in an arbitrary or capricious manner. *See* Pls.' Br. Supp. Perm. Inj. 18-21, ECF No. 68.

"[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A law that impermissibly delegates basic policy matters to administrative and judicial officials on an ad hoc and subjective basis is unconstitutionally vague.  *Id.* at 108-09.

Director Nix made this statement in response to questions proposed at a meeting with waste haulers.  *See* Pls.' Ex. 20 (Nov. 14, 2011 Meeting), at 13:1-6, 15:1-3.  Her response to hypothetical applications of the Flow Control Ordinance does not lead the Court to conclude that the ordinance authorizes discriminatory and arbitrary enforcement.  *See Roark*, 522 F.3d at 554 (finding that responses to "lengthy hypothetical questions" did not create an issue of arbitrary enforcement).  For Director Nix's interpretation of "solely recyclable material" to be binding, the Municipal Code provides that it would have to be in writing.  *See* Pls.' Ex. 7 (Municipal Code), at App. 7.  Once in writing, it applies equally to all Franchisees.  *Cf. Morales*, 527 U.S. at 63-64 (finding gang loitering ordinance void when officers could make "moment-to-moment" as opposed to uniform decisions).  Furthermore, Director Nix is constrained in defining "solely recyclable material" because the Municipal Code provides she must make this determination based on what is "suitable for re-use and/or recycling."  *See* Pls.' Ex. 7 (Municipal Code), at App. 7.  *See Grayned*, 408 U.S. at 113-114 (recognizing other parts of a statute or ordinance limit an administrative official's discretion); *see also Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 525-26 (1994) (finding other elements of a statute constrained executive officials).  Therefore, she is constrained in her interpretation of the terms by the express provisions of the Flow Control Ordinance, and by the dictates of *Chevron*.  Should her interpretation change, or should she apply the terms differently, Plaintiffs may be entitled to prevail in an as-applied challenge.  For now, Plaintiffs' Due Process claim fails.

b.      *Due Course of Law*

A statute or ordinance violates the Due Course of Law Clause of the Texas Constitution if it grants an officer unbridled discretion. *See Spann*, 235 S.W. at 517. Plaintiffs' complaint is that the delegation of authority to define essential terms in the Flow Control Ordinance provides Director Nix unbridled discretion. *See* Pls.' Br. Supp. Perm. Inj. 16-21, ECF No. 68. The Due Course of Law provision does not provide Plaintiffs any additional protection than does the federal Due Process Clause, and Plaintiffs do not argue otherwise. *See id.* at 14-15. In fact, Plaintiffs assert that its Due Course of Law challenge is the same as the second prong of the Due Process Clause, which analyzes the ordinance for arbitrary and discriminatory enforcement. *See id.* ("The Texas Due Course of Law Clause includes the second federal test for establishing impermissible vagueness, described in Texas as 'unbridled discretion.'"). Because Plaintiffs do not allege any additional protection beyond that afforded by the federal Due Process Clause, the Court's analysis under the federal Due Process Clause applies equally to Plaintiffs' Due Course of Law claim. *See Ex parte Anderson*, 902 S.W.2d 695, 701 (Tex. App.—Austin 1995, writ ref'd.) ("A state constitutional claim must provide a court with some basis for the application of a constitutional test beyond that required of a federal constitutional analysis."). Therefore, the Flow Control Ordinance does not violate the Due Course of Law Clause.

Based on the foregoing, the Court concludes that Plaintiffs have not shown that the Flow Control Ordinance is void for vagueness under either the federal Due Process Clause or the Texas Due Course of Law Clause.

     5.    <u>State Preemption</u>

Plaintiffs claim that the Flow Control Ordinance is preempted because it is in direct conflict with the Texas regulatory scheme governing recycling.  *See* Pls.' Br. Supp. Perm. Inj. 26-36, ECF No. 68.  They argue that the Flow Control Ordinance treats materials as solid waste that state law would characterize as recyclable.  *See id.* at 31-36.  Since state law prefers recycling waste over disposing of it in a landfill, Plaintiffs argue that the Flow Control Ordinance improperly conflicts with and is preempted by state law.  *See id.* at 26-27.

Home-rule cities, like Dallas, derive their powers from the Texas Constitution.  *See* Tex. Const. art. XI, § 5.[9]  The Texas Constitution vests home-rule cities with broad discretionary powers. *See Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993) Cities may enact an ordinance provided that it does not "contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State."  *See* Tex. Const. art. XI, § 5.  "Home-rule cities possess the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power."  *See Dall. Merch.'s*, 852 S.W.2d at 491.  An ordinance that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent that it conflicts with the state statute.  *See City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 796 (Tex. 1982).  "[T]he mere fact that the legislature has enacted a law addressing a subject does not mean the subject matter is completely preempted."  *City of Richardson v. Responsible Dog Owners*, 794 S.W.2d 17, 19 (Tex. 1990).  When the state legislature intends to preempt a subject traditionally within a home-rule city's broad powers, it must do so with "unmistakable clarity."  *See Dall. Merch.'s*, 852 S.W.2d at 490-91.  Accordingly, courts do not find

---

[9]  A home-rule city is a city with 5,000 or more inhabitants.  Tex. Const. art. XI, § 5.

conflict between a general law and a city ordinance "if any other reasonable construction leaving both in effect can be reached." *City of Beaumont v. Fall*, 291 S.W. 202, 206 (Tex. 1927).

Plaintiffs allege that the Flow Control Ordinance is in direct conflict with the state regulatory scheme governing recycling. *See* Pls.' Br. Supp. Perm. Inj. 26-36, ECF No. 68. Specifically, Plaintiffs argue that the Flow Control Ordinance exemption for "tramp materials" and the state law exemption for "integrated and damaged material" directly conflict.[10] *See id.* at 33-35. Under the Administrative Directive, the Franchisees may not dispose of more than 10% of "non-recyclable material," not including 4% of "tramp material" at non-City owned landfills. *See* Pls.' Ex. 1 (Flow Control Ordinance); Pls.' Ex. 8 (Administrative Directive). Under state law, however, a recycling facility may receive up to 10% of "incidental material" and an unlimited amount of "integrated and damaged materials." Thus, if a Franchisee delivers waste containing more than 10% of non-recyclable material and/or more than 4% tramp material, it must be disposed of at a city landfill even though that amount may also be delivered to a recycling center under state law. Because of this difference, Plaintiffs argue that the state law preempts the Flow Control Ordinance. The Court disagrees.

---

[10]   "Integrated and damaged materials" refers to materials that are non-recyclable but integral to the material being recycled. 30 Tex. Admin. Code § 328.2(3). Under state law, this includes:

> (A) the non-recyclable components of white goods, whole computers, whole automobiles, or other manufactured items for which dismantling and separation of recyclable from non-recyclable components by the generator are impractical, such as insulation or electronic components in white goods; (B) source-separated recyclable material rendered unmarketable by damage during collection, unloading, and sorting, such as broken recyclable glass; and (C) tramp materials, such as: (i) glass from recyclable metal windows; (ii) nails and roofing felt attached to recyclable shingles; (iii) nails and sheetrock attached to recyclable lumber generated through the demolition of buildings; and (iv) pallets and packaging materials.

*Id.*

Again, courts do not find conflict between a general law and a city ordinance if the two enactments can reasonably be construed together. *See Dall. Merch.'s*, 852 S.W.2d at 491. Here, the Flow Control Ordinance and state law apply to different disposal activities. The Flow Control Ordinance regulates disposal of solid waste at City-owned landfills. *See* Pls.' Ex. 1 (Flow Control Ordinance). The state law applies to storing and processing of recyclable and non-recyclable materials at recycling centers. *See* 30 Tex. Admin. Code §§ 328.1-328.5. "[I]f the state and local provisions serve different purposes, then different methods of determining compliance do not render the two provisions inconsistent." *S. Crushed Concrete, LLC v. City of Hous.*, No. 14-09-00873-CV, 2010 WL 4638417, at *5-6 (Tex. App.—Houston [14th Dist.] Nov. 17, 2010, pet. granted). As Plaintiffs admit, the state law is written in a way that expresses its preference for recycling waste over disposing of it in landfills. *See* Pls.' Br. Supp. Perm. Inj. 26-29, ECF No. 68. Nothing Plaintiffs present suggests that Texas has intended to preempt solid waste disposal as envisioned by the Flow Control Ordinance with unmistakable clarity. *See Dall. Merch.'s*, 852 S.W.2d at 491 (finding unmistakable clarity where the legislature provided in the statute: "It is the intent of the legislature that this code shall exclusively govern . . . .").

Plaintiffs also argue that the state law and Flow Control Ordinance directly conflict because the ordinance does not have a mechanism for requesting "alternative compliance" with the state's "incidental" materials requirements. *See* Pls.' Br. Supp. Perm. Inj. 36, ECF No. 68. This argument fails because the two enactments relate to different subject matters and regulate different activities. In other words, the two enactments serve different purposes and therefore do not directly conflict. *See S. Crushed Concrete*, 2010 WL 4638417, at *5-6.

Based on the foregoing, the Court finds that state law does not preempt the Flow Control Ordinance.

## C.  Immediate & Irreparable Harm

The Court finds that Plaintiffs have established the threat of immediate, irreparable harm. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable [harm] is necessary." *La. Seafood Mgmt. Council, Inc. v. Foster*, 917 F. Supp. 439, 442 n.1 (E.D. La. 1996). Additionally, irreparable harm may result if enforcement of an ordinance would yield fines and criminal penalties. *See Villas at Parkside Partners*, 577 F. Supp. 2d at 878.

Here, the Franchisees face a real and immediate threat of fines and criminal penalties. The Flow Control Ordinance provides that "[a] person commits an offense if" he or she disposes of any dry or wet solid waste at locations other than those owned by the City. *See* Pls.' Ex. 1 (Flow Control Ordinance), § 4. A person violating this provision faces a fine not to exceed $2,000. *See* Pls.' Ex. 7 (Municipal Code), at § 12.1(b). Chapter 18 of the Dallas City Code further provides that violations of the Flow Control Ordinance may result in a "criminal penalty" or "administrative penalties." *See id.* § 18-12.1(f). The City Code further provides that "[a] person is guilty of a separate offense for each day or part of a day during which the violation is committed, continued, or permitted." *See id.* § 12.1(a). Director Nix stated that the City intends to enforce the Flow Control Ordinance against the Franchisees. *See* Pls.' Ex. 27 (Nix Dep.), at 201:16-202:13.

Based on the foregoing, the Court finds that if the Flow Control Ordinance goes into effect, the Franchisees will be forced to choose between foregoing their vested rights under the Franchise Agreements and facing serious criminal sanctions for noncompliance. Accordingly, the Court finds

33

that Plaintiffs have shown immediate, irreparable harm that cannot be remedied monetarily. *See e.g.*, *Villas at Parkside Partners*, 577 F. Supp. 2d at 878.

###### D.    Balance of Equities

The balance of equities in this case weighs in favor of Plaintiffs.  The City argues that it passed the Flow Control Ordinance to address the immediate "shortcomings of the existing regulatory regime" and seize green technology opportunities. Defs.' Resp. Opp'n Perm. Inj. 44, ECF No. 73.  The City states that the public need not "await a true emergency before initiating the process of developing new technologies for the future." *Id.*  Plaintiffs point out, and the Court agrees, that the City enacted the Flow Control Ordinance to raise revenue, not to take advantage of green technology opportunities or address any shortcoming of the existing regulatory regime. *See supra* Part III.B.2.  In fact, as previously discussed, the City's Plan, dated October 2011, represents that "no new solid waste facilities or facility expansions [are] planned in the near future," and that "there will be sufficient private sector recyclables processing capacity within the region through [2060]." *See* Pls.' Ex. 19 (Waste Management Plan), at 35; *see also supra* Part III.B.2.  While the Court agrees that the City need not await an emergency before enacting "green" initiatives to address future problems, the evidence in the record establishes that the City has taken almost no action to implement its "green" plan. *See e.g.*, Pls.' Ex. 19 (Waste Management Plan), at 25 ("Although the current facilities are periodically updated and adjusted to meet the operational needs, there are no new solid waste facilities or facility expansions planned in the near future."); *see generally* Pls.' Ex. 40 (Egosi Decl.).  The fact that the City has private sector recycling capabilities for the next forty-five years weighs against the City's claim that it is addressing any current "shortcoming." *See* Pls.' Ex. 19 (Waste Management Plan), at 3.  In addition, Director Nix admitted that even without

flow control, solid waste is currently being handled in an environmentally sound and cost-efficient way.  *See* Pls.' Ex. 27 (Nix Dep.), at 45:17-23.

Furthermore, Plaintiffs have shown that they will suffer substantial economic harm if the Flow Control Ordinance goes into effect.  The Flow Control Ordinance would effectively eliminate an entire line of business for those Franchisees with landfill operations outside the City.  *See* Pls.' Ex. 31 (Stefkovich Dep.), at 43:2-6 ("This is a significant change, not changing a street from one direction to the other or from two way to one way.  This is a change that eliminates our ability to participate . . . in a whole line of business, the disposal line of business."); Pls.' Ex. 33 (Cox Decl.), at App. 5-6; Pls.' Ex. 34 (Stefkovich Decl.), at App. 9-10.   For two of the Franchisees, the Flow Control Ordinance will impose annual losses of over $13 million from their landfill operations. *See* Pls.' Ex. 41 (Branch Decl.), at App. 120-29.   Accordingly, this factor substantially weighs in Plaintiffs' favor.

Based on the foregoing, the Court finds that the City would suffer little to no harm as a result of the permanent injunction, while Franchisees would suffer immediate and substantial harm if the Flow Control Ordinance took effect.

### E.    Public Interest

The public's interests "necessarily overlap considerably" with the interests of the City.  *See Six Kingdoms Enters., LLC v. City of El Paso*, No. Ep-10-CV-485-KC, 2011 WL 65864, at *10 (W.D. Tex. Jan 10, 2011). Therefore, where the City does not have a legitimate interest in the enforcement of flow control, neither does the public.  *See id.*  As already mentioned, the City does not have a legitimate interest in the enforcement of the Flow Control Ordinance.  *See supra* Part III.B.2.  Therefore, enjoining the Flow Control Ordinance does not disserve the public's interest.

Additionally, the Court finds that the public has an interest in honoring the Franchise Agreements. Plaintiffs have shown that recycling and solid waste disposal is being handled in a cost-effective and safe manner. *See* Pls.' Ex. 27 (Nix Dep.), at 45:17-23. Plaintiffs have also shown that members of the public currently using Franchisees for waste disposal would not be adversely affected if the Flow Control Ordinance was enjoined. *See id.* 17:23-18:16; Pls.' Ex. 40 (Egosi Decl.), at App. 104-06. Furthermore, the public has expressed satisfaction with the way solid waste is being handled in Dallas. *See* Pls.' Ex. 27 (Nix Dep.), 18:17-19:12. Based on the foregoing, the Court finds that a permanent injunction would be in the public's interest.

## IV.    SEVERABILITY

Finally, the City argues that the provisions of the Flow Control Ordinance are severable and, therefore, if the City is enjoined from enforcing some provisions, the remaining provisions are still enforceable. *See* Defs.' Resp. Opp'n Perm. Inj. 48, ECF No. 73. Specifically, the City argues that the record-keeping and auditing sections should still apply to the Franchisees even if the Court finds that they are not required to dispose of waste at City-owned landfills. *See id.* The Franchise Agreements already provide that the City may access the Franchisees' books and records when conducting an audit to "verify the accuracy of the Franchise Fees paid to the City." *See, e.g.*, Pls.' Ex. 10 (Bluebonnet Franchise Agreement). Because the auditing provision in the Flow Control Ordinance is redundant, the Court concludes severability is not necessary.

## V.    CONCLUSION

Based on the foregoing, the Court finds that Plaintiffs have established that the City violated the Contract Clause of the United States Constitution and the Due Course of Law Clause of the Texas Constitution. Plaintiffs also established a violation of the City Charter; however, that claim

36

is dismissed as moot.  The Court also finds that Plaintiffs failed to establish that the City's Flow Control Ordinance is void for vagueness or preempted by state law.  As to the other elements of the permanent injunction test, the Court concludes that Franchisees will suffer irreparable harm if the Flow Control Ordinance is allowed to take effect; that the balance of equities favors Plaintiffs; and that a permanent injunction is in the public interest.  Since Plaintiffs' claims on the merits all turn on Franchisees' rights, the Court enjoins the City from enforcing the Flow Control Ordinance as to Franchisees and other franchisees not before the Court who have a right to dispose of solid waste at authorized facilities.

Accordingly, the Court hereby **GRANTS** Plaintiffs' permanent injunction request. Defendants are hereby **ENJOINED** from enforcing Dallas City Ordinance No. 28427 against Franchisees in this lawsuit and other franchisees who entered into franchise agreements with the City prior to the date of this decision.

**SO ORDERED** on this **16th day** of **October, 2012**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**